# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 22-418


ALISA ALAN DURKHEIMER

VERSUS

TRANISE L. LANDRY, ET AL.


**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 20146472
HONORABLE MARILYN C. CASTLE, DISTRICT JUDGE

**********

## VAN H. KYZAR
## JUDGE

**********

Court composed of D. Kent Savoie, Van H. Kyzar, and Gary J. Ortego, Judges.


**AFFIRMED AND RENDERED.**

Charles Benjamin Landry
C. Benjamin Landry, A Professional Law Corporation
1309 Lafayette Street
Lafayette, LA 70501
(337) 232-9806
COUNSEL FOR PLAINTIFF/APPELLEE/APPELLANT:
    Alisa Alan Durkheimer

Diana L. Tonagel
Mark D. Boyer
J. Brent Barry
Blake F. Harris
Rhonda S. Smith
Boyer, Hebert, Caruso & Angelle, LLC
1280 Del Este Avenue
Denham Spring, LA 70726
(225) 664-4335
COUNSEL FOR DEFENDANT/APPELLANT/APPELLEE:
    Trinity Universal Insurance Company

**KYZAR, Judge.**

The defendant, Trinity Universal Insurance Company, appeals from a trial court judgment awarding the plaintiff, Alisa Alan Durkheimer, penalties and attorney fees based on a jury's finding that it acted arbitrarily and capriciously in its handling of her uninsured motorist claim. Ms. Durkheimer also appeals the trial court's reduction of the jury award in conformity with her uninsured motorist policy limits and its calculation of the penalty award. For the following reasons, we affirm the judgment and award Ms. Durkheimer additional attorney fees.

## FACTS AND PROCEDURAL HISTORY

At approximately noon on January 14, 2014, Ms. Durkheimer (Plaintiff) was driving north on Southpark Road in Lafayette, Louisiana, when she slowed down because the vehicle ahead of her had stopped to make a left turn. As she was slowing to a stop, she was struck from behind by a vehicle driven by Tranise L. Landry, who was cited for careless operation. Plaintiff experienced an immediate onset of neck and lower back pain and headache, and after seeking medical treatment, she was diagnosed with a head contusion and cervical and lumbar sprains. When her symptoms continued, she sought further treatment, including extensive physical therapy and epidural steroid lumbar injections. Eventually, Plaintiff, who had subsequently moved to Denver, Colorado, underwent two surgical procedures for her neck pain, an anterior cervical discectomy and fusion (ACDF) at C4-5 and an ACDF at C5-6.

On December 30, 2014, Plaintiff filed suit against Ms. Landry and her auto insurer, State Farm Fire and Casualty Company (State Farm), and her own uninsured motorist (UM) insurer, Trinity Universal Insurance Company (Defendant), seeking

damages for the injuries she suffered as a result of the accident.[1] Defendant answered the petition, pleading, among others, the affirmative defense of comparative fault. It later amended its answer to plead the affirmative defense of sudden emergency doctrine. On June 1, 2016, an order of partial dismissal was rendered by the trial court, dismissing Plaintiff's claims against Ms. Landry and State Farm after a settlement was reached between the parties.

On December 14, 2018, Plaintiff filed a first supplemental and amending petition, alleging bad faith on the part of Defendant in its handling of her UM claim and seeking penalties and attorney fees pursuant to La.R.S. 22:1892 and La.R.S. 22:1973. After denying this allegation, Defendant moved for a peremptory exception of no cause of action on the issue of bad faith, which the trial court denied. Thereafter, Defendant filed a motion for summary judgment on the same issue. Following a hearing, the trial court denied Defendant's motion. A written judgment was rendered on this issue on March 4, 2020. Defendant filed an application for supervisory writs on the denial of its motion, which this court denied. *Durkheimer v. Trinity Universal Ins. Co.*, 20-75 (La.App. 3 Cir. 3/13/20) (unpublished writ).[2]

The matter proceeded to a jury trial, which was heard between October 18–22, 2021. At the start of the trial, the parties stipulated to the following: the accident occurred on January 14, 2014; State Farm provided Ms. Landry with $15,000.00 in liability coverage; Defendant was Plaintiff's UM provider; State Farm tendered its policy limits to Plaintiff on September 26, 2015; Defendant unconditionally tendered its $25,000.00 medical payments (med-pay) policy limits to Plaintiff by December 15, 2015; Defendant received Ms. Landry's affidavit on April 4, 2016, confirming

---

[1] The UM coverage is contained in the auto policy issued by Defendant to Plaintiff's mother.

[2] The name of the unpublished writ should actually be titled *Durkheimer v. Landry.*

2

she had no other insurance at the time of the accident and proof of Plaintiff's underinsured status; and photos of the two vehicles taken by the insurers were deemed authenticated.

After Plaintiff rested her case, Defendant moved for a directed verdict on the issue of bad faith, which the trial court denied. At the conclusion of the trial, the jury rendered a verdict finding Ms. Landry 100% at fault in causing the accident and Plaintiff's injuries. It awarded Plaintiff $325,000.00 in past medical expenses and $375,000.00 in general damages. It further held that Defendant acted arbitrarily, capriciously, or without probable cause in failing to pay $325,000.00 to Plaintiff on her UM claim within the statutory period.

A judgment on the jury verdict was rendered by the trial court on November 16, 2021, awarding Plaintiff a total of $700,000.00 in damages and reserving the award of penalties and attorney fees to a later hearing.[3] Thereafter, Plaintiff moved to assess penalties, attorney fees, and costs, and Defendant moved for a judgment notwithstanding the verdict (JNOV), for remittitur and revision of the judgment, and/or, alternatively, for a new trial. Attached to Defendant's motion, as well as its opposition to Plaintiff's motion, was an unredacted copy of the declarations page of Plaintiff's policy with Defendant, which established the UM policy limits as $500,000.00. Plaintiff moved to strike the declarations page, arguing that it was inadmissible evidence since Defendant failed to proffer it during the jury trial.

Following hearings on these motions, the trial court denied Plaintiff's motion to strike and denied Defendant's motions for JNOV and new trial. In granting Defendant's motion for remittitur or revision, the trial court reduced the $700,000.00 jury award to the $500,000.00 UM policy limits. It further reduced the $500,000.00

---

[3] Judgment was originally rendered by the trial court on November 5, 2021. However, the trial court subsequently rendered the "alternative" November 16, 2021 judgment.

3

by $69,798.48,[4] for a total damage award of $430,201.52. The trial court granted

Plaintiff's motion to assess penalties and attorney fees, awarding her $162,500.00 in

penalties, or 50% of $325,000.00, and $197,567.17 in attorney fees pursuant to

La.R.S. 22:1892(B)(1)(a), as well as $23,175.57 in expert witness fees and costs.

Judgment was rendered on these issues on February 1, 2022. It is from this

judgment, as well as the trial court's denial of its motion for summary judgment, that

Defendant appeals.

On appeal, Defendant raises seven assignments of error:

1. The trial court erred in refusing to grant [Defendant's] pre-trial motion for summary judgment on the alleged bad faith penalty claim[.]

2. The trial court erred as a matter of law in admitting inadmissible evidence as to plaintiff's alleged bad faith claim[.]

3. The trial court erred as a matter of law in refusing to grant [Defendant's] motion for directed verdict on the alleged bad faith penalty claim[.]

4. The jury's verdict finding bad faith was tainted and contrary to law[.]

5. The trial court erred in submitting the presumption and/or the incorrect *Housley* instruction to the jury to decide[.]

6. The trial court erred in denying Defendant's motion for JNOV on the finding of bad faith[.]

7. The trial court erred in admitting testimony of David Barczyk, D.C.

Plaintiff, who also appealed the judgment, raises five assignments of error:

1. The trial court erred in reducing the liability of the UM/UIM insurer, [Defendant], to its policy limits when the policy limits were intentionally not admitted into evidence and are not part of the appeal record.

2. The trial court incorrectly calculated mandatory statutory penalties under La.R.S. 22:1892, in direct violation of the

---

[4] The amount was based on Defendant's unconditional tenders of $54,409.99 and a Medicaid payment of $15,388.49 received by Plaintiff.

statutory language which instructs the court how penalties are imposed.

3. The quantum awarded for general damages for two anterior cervical disc surgeries with fusions with ongoing disability and back injury, including nearly (8) eight years of intense suffering and tremendous loss of enjoyment of life, was abusively low.

4. Since the trial court erroneously reduced the total award by policy limits that were not introduced, erroneously applied the law on the calculation of insurer penalties, and since the jury's award of general damages was abusively low, the attorney fees awarded by the trial court, that were calculated as 33% of the total award, were too low and should be adjusted upward to account for the increased total award on appeal.

5. Since attorney fees were awarded to Plaintiff in the trial court, Plaintiff-Appellant requests that additional attorney fees be awarded for the present appeal.

We will consider Defendant's appeal first.

## OPINION

## DEFENDANT'S APPEAL

Defendant's appeal can be broken down into two primary areas of challenge. Assignments of error two, five, and seven relate to evidentiary and procedural matters. Assignments of error one, three, four, and six relate to the merits of the claim and the finding that Defendant was in bad faith in its handling of Plaintiff's claim. We first consider the issues related to the evidentiary and procedural matters as the finding of such errors could result in a *de novo* review of the remaining issues if the jury's factfinding process was interdicted by such error. *Roach v. State through Dep't of Transp. & Dev.*, 20-211, 20-212 (La.App. 3 Cir. 9/22/21), 329 So.3d 974, *writ denied*, 21-1527 (La. 1/12/22), 330 So.3d 621.

### *Assignment of Error Number Two*

In its second assignment of error, Defendant argues that the trial court abused its discretion by allowing Plaintiff to introduce into evidence exhibits P-55, P-56, P-62, and P-63, which exhibits, it argues, were not disclosed on Plaintiff's pretrial

5

exhibit list and were not authenticated by Plaintiff prior to their admission into evidence. Defendant further contends that the introduction of these exhibits substantially prejudiced its defense and improperly prejudiced the jury, such that it interdicted the jury's factfinding process in determining whether it acted in bad faith. Thus, it argues the jury's finding of bad faith should be reversed and the matter reviewed by this court pursuant to a *de novo* review.

With regard to a trial court's evidentiary rulings, this court, in *Rayburn v. State Farm Mutual Automobile Insurance Co.*, 21-160, pp. 2–3 (La.App. 3 Cir. 11/10/21), 330 So.3d 709, 712–13, stated:

> The trial court is accorded vast discretion concerning the admission of evidence, and its decision will not be reversed on appeal unless it has abused that discretion. *Maddox v. Omni Drilling Corp.*, 96-1673 (La.App. 3 Cir. 8/6/97), 698 So.2d 1022, *writs denied*, 97-2766, 97-2767 (La. 1/30/98), 709 So.2d 706. If the trial court has abused its discretion and the jury's verdict is tainted, we conduct a de novo review. *McLean v. Hunter*, 495 So.2d 1298 (La.1986). Prejudicial errors materially affect the outcome of the trial and deprive a party of their rights. *Evans v. Lungrin*, 97-0541, 97-0577 (La. 2/6/98), 708 So.2d 731. In determining if the error has substantially affected the outcome of the case we look to the record as a whole. *Wallace v. Upjohn Co.*, 535 So.2d 1110 (La.App. 1 Cir. 1988), *writ denied*, 539 So.2d 630 (La.1989).

The exhibits at issue are emails sent by Plaintiff to Defendant, as follows:

1.  P-55: An August 7, 2019 email informing Defendant about Plaintiff's upcoming December 13, 2019 anterior cervical discectomy and arthroplasty recommended by Dr. Sanjay Jatana and enclosing surgery estimates of $6,504.00 and $4,884.00 for Dr. Jatana and anesthesiology, respectively.

2.  P-56: A February 18, 2020 email providing Defendant the medical bills for Plaintiff's pre-op and overnight stay at Rose Medical Center for the ACDF at C5-6 performed by Dr. Jatana.

3.  P-62: A January 7, 2019 email containing Plaintiff's updated medical bills, totaling $152,193.68.

4.  P-63: A March 12, 2019 email following up on the January 7, 2019 email.

6

In her July 31, 2020 "Consolidated Amended Witness and Exhibit List," Plaintiff stated that she would be introducing at trial "[a]ll evidence showing Defendant's bad-faith handling of claim including, but not limited to the depositions of all defense witnesses, all non-disclosed evidence, all evidence withheld in response to subpoena, requests for pre-trial evidence, all impeachment evidence to any evidence introduced by defendant . . . at trial[.]" (Converted to sentence case.)

Although the trial court initially sustained Defendant's objection to the these exhibits due to a lack of foundation, it later allowed them into evidence, over Defendant's objection, after Plaintiff introduced the January 23, 2020 deposition of Belinda Henschel, a litigation specialist with Defendant's parent company, Kemper. During Ms. Henschel's deposition, counsel for Defendant admitted that information pertaining to Plaintiff's December 13, 2019 surgery performed by Dr. Jatana had been received and forwarded to Ms. Henschel. Furthermore, Ms. Henschel testified that she was aware of this surgery.

Much of the deposition centered on the decisions Defendant made regarding Plaintiff's claim and the information it knew in making these decisions. The exhibits offered and admitted by the trial court related to those decisions, and a proper foundation existed once Ms. Henschel admitted knowledge of the surgery performed by Dr. Jatana. As to the January 7 and March 9, 2019 emails, including Plaintiff's updated medical expenses, Ms. Henschel admitted that Defendant made unconditional tenders to Plaintiff in excess of her $25,000.00 med-pay coverage. Again, this provided a basis for relevancy and a foundational support for these emails.

In allowing the emails into evidence, the trial court stated, "It's evidence that [Plaintiff's counsel] submitted an estimate. It is just an estimate, but its evidence that he submitted an estimate. That's why it comes in." Based on its vast discretion

7

in admitting or excluding evidence, we find that the trial court did not abuse its discretion in allowing these exhibits into evidence.

### *Assignment of Error Number Five*

Here, Defendant argues that the trial court erred in instructing the jury regarding the presumption found in *Housley v. Cerise*, 579 So.2d 973 (La.1991), and, alternatively, that the instruction as given was incorrect.

Defendant's argument is two-fold. It first argues that the *Housley* presumption was inappropriate because Plaintiff failed to establish, through medical testimony, that the symptoms she experienced subsequent to the accident were caused by the accident. Defendant next argues that the trial court's *Housley* instruction was misleading in that it "allow[ed] the jurors to consider any 'circumstantial' claims and showing only 'a reasonable *possibility* of causation between the accident and injury claimed,' rather than *medical proof of injury causation* as required" by *Housley*.[5] We disagree with both arguments.

It is well settled that "a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct." *Lasha v. Olin Corp.*, 625 So.2d 1002, 1005 (La.1993). Thus, a "defendant's liability for damages is not mitigated by the fact that the plaintiff's preexisting physical infirmity was responsible in part for the consequences of the plaintiff's injury by the defendant." *Id.* Moreover, if the plaintiff's preexisting condition is aggravated as a result of the defendant's conduct, "the defendant must compensate the victim for the full extent of the aggravation." *Id.* at 1006.

In *Housley*, 579 So.2d 973, the supreme court applied the presumption of liability utilized in workers' compensation matters to the question of whether the

---

[5] Defendant preserved this issue for appeal by making a contemporaneous objection to the instruction before the trial court instructed the jury.

wife's premature rupture of her amniotic sac was caused by her fall when she slipped on a wet carpet. In doing so, the supreme court stated:

> [a] claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection between the accident and the disabling condition.
>
> . . . We find this principle to be applicable in the present case.

*Id.* at 980 (alteration in original) (quoting *Lukas v. Ins. Co. of N. Am.*, 342 So.2d 591, 596 (La.1977)).

This court has held that the requirement that the plaintiff be in good health prior to the accident "has been interpreted as not requiring that the afflicted body part be 'in perfect health.'" *Brown v. Town of Ferriday*, 11-570, p. 6 (La.App. 3 Cir. 11/2/11), 76 So.3d 155, 160. In *Layssard v. State, Department of Public Safety & Corrections*, 07-78, p. 9 (La.App. 3 Cir. 8/8/07), 963 So.2d 1053, 1061, *writ denied*, 07-1821 (La. 11/9/07), 967 So.2d 511, this court held that while the plaintiff's medical records might have indicated that his "hip was not in perfect health, it does not mean that his hip was not in 'good health' for purposes of *Housley*." *See also Brock v. Singleton*, 10-550 (La.App. 5 Cir. 3/29/11), 65 So.3d 649, *writ denied*, 11-1216 (La. 9/23/11), 69 So.3d 1160.

After reviewing the record, we find that the trial court did not err in presenting the *Housley* presumption to the jury. The main issue in this matter was whether Plaintiff's symptoms and treatment, including her two ACDF surgeries, were related to the January 14, 2014 accident or to injuries she suffered when skiing competitively as a teenager. Essential to this issue was a determination of whether Plaintiff was in good health prior to the accident. During the trial, the jury was presented with extensive evidence on this issue, including Plaintiff's testimony and

the testimonies of her sister, her treating physicians, Ms. Landry, the emergency room nurse practitioner, two claims adjusters, two experts in accident reconstruction and biomechanics, and Defendant's medical expert. The jury also considered Plaintiff's medical history, dating from 2005–2019. Considering the importance of this issue, we find that the trial court did not err in instructing the jury on the *Housley* presumption.

With regard to Defendant's second argument, "[a] trial court has broad discretion in formulating jury instructions. The adequacy of any one jury instruction is determined in the light of the instructions as a whole." *Renfro v. Burlington N. Santa Fe Ry. Co.*, 15-372, p. 8 (La.App. 3 Cir. 5/11/16), 193 So.3d 1192, 1200 (citation omitted).

> The trial court must give jury instructions that properly reflect the law applicable to the facts of the particular case. *Brown v. Diamond Shamrock, Inc.*, 95-1172 (La.App. 3 Cir. 3/20/96); 671 So.2d 1049. To fulfill this duty, the trial court must both insure that the jury considers the correct law and, in giving the instructions, avoid confusing the jury. *Id.* In *Iorio v. Grossie*, 94-846, pp. 2-3 (La.App. 3 Cir. 10/4/95); 663 So.2d 366, 368-69, this court stated:
>
>> A trial court should give all requested instructions that correctly state the law, provided that they are material and relevant to the litigation. Courts are not obligated to give the specific jury instructions submitted by the parties, but omission of a requested instruction containing an essential legal principal [sic] may constitute reversible error. A court has fulfilled its duty if its instructions fairly and reasonably point out the issues presented by the pleadings and evidence and provide the principles of law necessary to resolve those issues.
>>
>> An appellate court must exercise great restraint before overturning a jury verdict on the basis of erroneous instructions. Consequently, we will overturn the jury's verdict in the case *sub judice* on the basis of such an error only if the instructions, taken as a whole, were so incorrect or inadequate as to preclude the jury from reaching a verdict based on the relevant law and facts. Ultimately, the pertinent inquiry is whether the jury was misled to such an extent as to be prevented from doing justice.

(Citations omitted).

*Mathews v. Dousay*, 96-858, p. 8 (La.App. 3 Cir. 1/15/97), 689 So.2d 503, 509–10 (alteration in original).

Here, the trial court instructed the jury on the *Housley* presumption, as follows:

> You may presume that the plaintiff's injuries were caused by this accident, if, number one, she demonstrates that she was in good health and symptom free prior to the accident; and, number two, she demonstrates that, subsequent to the accident, symptoms of the alleged injury appeared and have continuously manifested themselves thereafter; and, three, she demonstrates that through evidence – medical, circumstantial, or common knowledge – a reasonable probability of causation between the accident and the injury claimed.

After reviewing the jury instructions as a whole, we find that the trial court provided the jury with the correct principles of law corresponding to these issues, including the *Housley* presumption, such that the jury was not misled by the instructions nor prevented from dispensing justice. *Adams v. Rhodia, Inc.*, 07-2110 (La. 5/21/08), 983 So.2d 798.

"In civil cases, a party who has the burden of proof must prove the fact in issue by a preponderance of the evidence, and not by some artificially created greater standard." *Talbot v. Talbot*, 03-814, p. 9 (La. 12/12/03), 864 So.2d 590, 598. A preponderance of the evidence may be proven by either direct or circumstantial evidence "when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not." *Lasha*, 625 So.2d at 1005. Defendant argues that the trial court erred in instructing the jury that Plaintiff's proof of causation would be satisfied by "a reasonable possibility of causation between the accident and injury claimed[,]" rather than "*medical proof of injury causation*[.]" We disagree with this argument because the phrase used by the trial court comes straight from *Housley*. Moreover, in *Lasha*, 625 So.2d at 1005, the supreme court stated:

11

[B]ecause the word "medical" is susceptible of being construed as referring only to expert medical testimony, the use of the phrase "reasonable medical certainty" tends to preclude the trier of the facts from considering evidence other than that of expert medical witnesses. While expert medical evidence is sometimes essential, it is self-evident that, as a general rule, whether the defendant's fault, was a cause in fact of a plaintiff's personal injury or damage may be proved by other direct or circumstantial evidence. *Jordan v. Travelers Ins. Co.*, 245 So.2d at 155; See Prosser, Torts, § 41, p. 269 (5th ed. 1984) ("Where the conclusion is not one within common knowledge, expert testimony may provide a sufficient basis for it, but in the absence of such testimony it may not be drawn. But on medical matters within common knowledge, no expert testimony is required to permit a conclusion as to causation.") (Footnotes citing authorities omitted.) cf. *Carpenter v. Nelson*, 101 N.W.2d at 922, and authorities cited therein.

Besides, in *Housley*, the supreme court considered both medical evidence and testimony establishing the wife's physical condition before and immediately after her fall in finding that the plaintiffs satisfactorily proved, by a preponderance of the evidence, that the fall caused the premature rupture of her amniotic sac. Accordingly, we find no error in the trial court's *Housley* instruction as given.

### Assignment of Error Number Seven

In its seventh assignment of error, Defendant argues that the trial court erred in admitting the testimony of David Barczyk, D.C., who was accepted as an expert in the fields of accident reconstruction and biomechanics.

A trial court has great discretion in determining who qualifies as an expert and whether expert testimony is admissible, and its decision admitting or excluding such testimony will not be reversed on appeal in the absence of clear error. *Mistich v. Volkswagen of Ger., Inc.*, 95-939 (La. 1/29/96), 666 So.2d 1073. Although the abuse of discretion standard is highly deferential to the trial court, it is not absolute.

The abuse-of-discretion standard is highly deferential to the trial judge's determination under consideration. *See LCR-M Ltd. P'ship v. Jim Hotard Prop., L.L.C.*, 13-0483, p. 9 (La.App. 4 Cir. 10/9/13), 126 So.3d 668, 675. An abuse of discretion generally results from a conclusion reached capriciously or in an arbitrary manner. *See Tugwell v. Plaquemines Parish Gov't*, 14-0657, p. 5 (La.App. 4 Cir. 11/19/14), 154 So.3d 695, 699. "Arbitrary or capricious" means the absence of a

12

rational basis for the action taken. *See A.S. v. D.S.*, 14-1098, p. 17 (La.App. 4 Cir. 4/8/15), 165 So.3d 247, 257. And a court necessarily abuses its discretion if its ruling is based on an erroneous view of the law. *See Show & Tell of New Orleans, L.L.C. v. Fellowship Missionary Baptist Church*, 14-0843, p. 8 (La.App. 4 Cir. 12/17/14), 156 So.3d 1234, 1240.

*Boudreaux v. Bollinger Shipyard*, 15-958, 15-1345, p. 16 (La.App. 4 Cir. 6/22/16), 197 So.3d 761, 771.

Based on our review of Dr. Barczyk's qualifying and traversal testimony, we find no clear error in the trial court's ruling accepting him as an expert in accident reconstruction and biomechanics. Although he is a licensed chiropractor, Dr. Barczyk testified that he is certified by the Institute of Police Technology and Management in the field of motor-vehicle crash biomechanics, having taken over 300 hours of course work in that field. He further testified that he was certified by the Accreditation Commission for Traffic Accident Reconstruction in 2016, in the field of accident reconstruction. We also note that Dr. Barczyk has been upheld as an expert in biomechanics by this court. *See Copell v. Arceneaux Ford, Inc.*, 20-299 (La.App. 3 Cir. 6/9/21), 322 So.3d 886; *Taylor v. Progressive Sec. Ins. Co.*, 09-791 (La.App. 3 Cir. 4/7/10), 33 So.3d 1081, *writ denied*, 10-1024 (La. 9/17/10), 45 So.3d 1044. Given the vast discretion accorded to the trial court in qualifying an expert witness, we find no abuse of discretion in the acceptance of Dr. Barczyk as an expert in these fields.

### *Assignment of Error Number One*

In its first assignment of error related to the merits, Defendant asserts that the trial court erred in refusing to grant its motion for summary judgment on the alleged bad faith claim. Summary judgment is a procedural device properly used when there is no genuine issue of material fact. *Murphy v. Savannah*, 18-991 (La. 5/8/19), 282 So.3d 1034; La.Code Civ.P. art. 966. Appellate courts review summary judgments *de novo* using the same criteria that governs the trial court's determination of

13

whether summary judgment is appropriate, i.e., whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. *Wright v. La. Power & Light*, 06-1181 (La. 3/9/07), 951 So.2d 1058; La.Code Civ.P. art. 966(A)(3).

In ruling on the motion, the trial court essentially determined that the motion was premature given the nature and status of the case relative to Plaintiff's bad faith claim. Defendant filed its motion on January 10, 2020, and subsequently, but prior to the February 26, 2020 hearing on the motion, Plaintiff submitted additional medical bills to Defendant on February 18, 2020. Thus, the trial court denied Defendant's motion, finding that it would not be appropriate to render judgment on the bad faith issue because "the tenders and the treatment are ongoing." The trial court stated:

> Well, it doesn't matter what [Plaintiff] allege[s]. It matters what the record shows. And, I mean, even in what you submitted, there are disputes about it.
>
> I mean, you submitted claims information where you acknowledge that she has more expenses than this, but this is how you evaluate it.
>
> And, again, you know, apparently, she's got ongoing treatment, which means that, every time they submit a claim, another 30 days runs for you to evaluate that claim. So I'm going to deny the motion for summary judgment. I don't think I can issue – or it would be appropriate to issue the motion for summary judgment.
>
> You are certainly going to be entitled to jury charges to the jury about what arbitrary and capricious is. And, you know, people can make their arguments on both sides.
>
> But I don't think this is a situation where I can exclude that claim, particularly because, apparently, the tenders and the treatment are ongoing.

In so holding, the trial court noted that the supreme court had recently held that an insured's bad faith claim is subject to a ten-year prescriptive period. This obviously refers to *Smith v. Citadel Insurance Co.*, 19-52, p. 10 (La. 10/22/19), 285

14

So.3d 1062, 1069, in which the supreme court held, "Because we find an insurer's bad faith is a breach of its contractual obligation and fiduciary duty, we hold the insured's cause of action is personal and subject to a ten-year prescriptive period."

We agree with the trial court's denial of summary judgment at this stage of the proceeding and find no error in its ruling. "[S]ummary judgment is appropriate when all the relevant facts are marshalled before the court, the marshalled facts are undisputed, and the only issue is the ultimate conclusion to be drawn from those facts." *Smith v. Our Lady of the Lake Hosp., Inc.*, 93-2512, p. 29 (La. 7/5/94), 639 So.2d 730, 752. Considering that the facts pertaining to Plaintiff's bad faith claim were still being developed as the case progressed, summary judgment was inappropriate.

Further, we note that following the denial of Defendant's motion, a trial on the merits of the claim resulted in a jury verdict in favor of Plaintiff. Although La.Code Civ.P. art. 966(A)(4) restricts the documents that can be considered in support of or opposition to a motion for summary judgment, the supreme court, in *Hopkins v. American Cyanamid Co.*, 95-1088, p. 13 (La. 1/16/96), 666 So.2d 615, 624, held:

> [O]nce a case is fully tried, the affidavits and other limited evidence presented with a motion for summary judgment—later denied by the district court—are of little or no value. Appellate courts should not rule on appeal after a full merits trial on the strength alone of affidavits in support of a motion for summary judgment that was not sustained in the district court. In such cases, appellate courts should review the entire record.

As Plaintiff's bad faith claim was tried on the merits, with Defendant having appealed the denial of its motion for directed verdict, the jury's verdict, and the denial of its motion for JNOV on this issue, we are required to consider all admissible evidence presented to the jury. Thus, we find that any decision as to the

15

correctness of the trial court's denial of the motion for summary judgment is subsumed therein.

### *Assignment of Error Number Three*

In this assignment, Defendant argues that the trial court erred by not granting a directed verdict at the close of Plaintiff's case on the issue of bad faith.

When reviewing a directed verdict, this court must consider the evidence presented and determine whether reasonable persons could have . . . reached a contrary verdict. *Maturin v. Bayou Teche Water Works, Inc.*, 20-257 (La.App. 3 Cir. 12/16/20), 310 So.3d 627, *writ denied*, 21-68 (La. 3/2/21), [311] So.3d [1061]. A directed verdict should only be granted when the evidence presented overwhelmingly leads to one conclusion. *Id.*

> A trial judge has much discretion in determining whether or not to grant a motion for directed verdict. *McNeely v. Ford Motor Company, Inc.*, 98-2139 (La.App. 1st Cir. 12/28/99), 763 So.2d 659, 664, *writ denied*, 2000-0780 (La. 4/28/00), 760 So.2d 1182. A motion for directed verdict is appropriately granted in a jury trial when, after considering all evidentiary inferences in the light most favorable to the movant's opponent, it is clear that the facts and inferences are so overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict. *Pratt v. Himel Marine, Inc.*, 2001-1832, p. 17 (La.App. 1st Cir. 6/21/02), 823 So.2d 394, 406, *writs denied*, 2002-2128 (La. 11/1/02), 828 So.2d 572.
>
> However, if there is substantial evidence opposed to the motion, *i.e.*, evidence of such quality and weight that reasonable and fair-minded jurors in the exercise of impartial judgment might reach different conclusions, the motion should be denied, and the case submitted to the jury. *Pratt*, 2001-1832 at pp. 17-18, 823 So.2d at 406. Furthermore, the propriety of a directed verdict must be evaluated in light of the substantive law underpinning the plaintiff's claims. Legal sufficiency of the evidence challenges, such as those presented by motions for directed verdicts, are reviewed on appeal *de novo. Hall v. Folger Coffee*

16

*Company*, 2003-1734, p. 10 (La. 4/14/04), 874 So.2d 90, 99.

*Maturin*, 310 So.3d at 634 (quoting *Wright v. Bennett*, 04-1944, pp. 15-16 (La.App. 1 Cir. 9/28/05), 924 So.2d 178, 187-88).

"[T]he appellate court must determine if the record supports the granting of a directed verdict, based not on a credibility determination (a factual issue), but on a sufficiency of the evidence determination (a question of law)." *Davis v. Bd. of Sup'rs of Louisiana State Univ. and Agr. Mech. Coll.*, 03-2219, p. 8 (La.App. 4 Cir. 11/17/04), 887 So.2d 722, 727, *writ denied*, 04-3086 (La. 2/18/05), 896 So.2d 40.

*Fontenot v. UV Ins. Risk Retention Grp., Inc.*, 20-361, 20-362, pp. 7–8 (La.App. 3 Cir. 4/14/21), __ So.3d __, __, *writ denied*, 21-656 (La. 10/5/21), 325 So.3d 357.

Our analysis of the jury's determination on the merits of whether Defendant was in bad faith, as set forth below, and the trial court's denial of Defendant's motion for JNOV establishes that the trial court did not abuse its discretion in denying Defendant's motion for directed verdict at the close of Plaintiff's case-in-chief. Thus, we find this allegation of error to be without merit.

### Assignments of Error Numbers Four and Six

In these assignments of error, Defendant argues that the jury was manifestly erroneous in finding that it acted in bad faith in its handling of Plaintiff's UM claim. It further argues that the trial court erred in denying its motion for JNOV on this same issue. Basically, Defendant argues that Plaintiff only suffered a soft tissue injury as a result of the January 14, 2014 accident, which should have resolved within six months. It claims that her subsequent treatment and surgeries were all related to injuries she suffered while skiing competitively as a teenager. Based on these claims, Defendant argues that it was not in bad faith and that it was error for the jury to conclude otherwise. We will address these assignments together.

The jury determined that Defendant was in bad faith and that it should have tendered at least $325,000.00 to satisfy its obligation to Plaintiff, which finding, Defendant asserts, was erroneous. The standard of review applicable to a jury's

17

factual findings was set forth in *Fontenot v. Patterson Insurance*, 09-669, pp. 8–9

(La. 10/20/09), 23 So.3d 259, 267, as follows:

> In reviewing the factual findings of a trial court, we are limited
> to a determination of manifest error. *Hill v. Morehouse Parish Police
> Jury*, 95-1100, p. 4 (La.1/16/96), 666 So.2d 612, 615. It is well settled
> that an appellate court may not disturb a jury's finding of fact unless
> the record establishes that a factual, reasonable basis does not exist and
> the finding is clearly wrong or manifestly erroneous. *Syrie v. Schilhab*,
> 96-1027, p. 4 (La.5/20/97), 693 So.2d 1173, 1176. An appellate court
> must do more than simply review the record for some evidence which
> supports or controverts the findings. *Stobart v. State of La., through
> Dep't of Transp. & Dev.*, 617 So.2d 880, 882 (La.1993). It must instead
> review the record in its entirety to determine whether the factual
> findings were clearly wrong or manifestly erroneous. *Id.*

> Significantly, the issue to be resolved is not whether the jury was
> right or wrong, but whether its conclusion was reasonable. *Id.* Thus,
> this Court, after a full review of the record, may not reverse reasonable
> findings, even if we had weighed the evidence differently sitting as the
> trier of fact. *Siverd v. Permanent General Ins. Co.*, 05-0973, p. 3
> (La.2/22/06), 922 So.2d 497, 500.

Defendant also urges that JNOV was warranted to overturn the jury's verdict

on the issue of bad faith.

> The use of JNOV is provided for by La. C.C.P. art. 1811. A
> JNOV may be granted on the issue of liability or on the issue of
> damages or on both issues. La. C.C.P. art. 1811(F). Article 1811 does
> not specify the grounds upon which the district court may grant a
> JNOV; however this court has set forth the criteria to be used in
> determining when a JNOV is proper as follows:

>> [A] JNOV is warranted when the facts and inferences
>> point so strongly and overwhelmingly in favor of one party
>> that the trial court believes that reasonable persons could
>> not arrive at a contrary verdict. The motion should be
>> granted only when the evidence points so strongly in favor
>> of the moving party that reasonable persons could not
>> reach different conclusions, not merely when there is a
>> preponderance of evidence for the mover. The motion
>> should be denied if there is evidence opposed to the
>> motion which is of such quality and weight that reasonable
>> and fair-minded persons in the exercise of impartial
>> judgment might reach different conclusions. In making
>> this determination, the trial court should not evaluate the
>> credibility of the witnesses, and all reasonable inferences
>> or factual questions should be resolved in favor of the non-
>> moving party.

18

*Joseph v. Broussard Rice Mill, Inc.*, 00-0628, pp. 4–5 (La.10/30/00), 772 So.2d 94, 99 (internal citations omitted). *See also VaSalle v. Wal-Mart Stores, Inc.*, 01-0462, p. 11 (La.11/28/01), 801 So.2d 331, 338–39. The rigorous standard of JNOV is based upon the principle that "when there is a jury, the jury is the trier of fact." *Joseph*, 00-0628 at p. 5, 772 So.2d at 99 (quoting *Scott v. Hospital Serv. Dist. No. 1*, 496 So.2d 270, 273 (La.1986)).

In reviewing a JNOV, an appellate court must first determine whether the district judge erred in granting the JNOV by using the above-mentioned criteria in the same way as the district judge in deciding whether to grant the motion. *VaSalle*, 01-0462 at pp. 11–12, 801 So.2d at 339. Thus, the appellate court must determine whether the "facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict." *Id.* at p. 12, 801 So.2d at 339 (quoting *Joseph*, 00-0628 at p. 5, 772 So.2d at 99). If the appellate court determines that reasonable persons might reach a different conclusion, then the district judge erred in granting the motion and the jury verdict should be reinstated. *Id.*

*Trunk v. Med. Ctr. of La. at New Orleans*, 04-181, pp. 4–5 (La. 10/19/04), 885 So.2d 534, 537 (alteration in original).

Essentially, we conclude that both allegations relate to the reasonableness of the jury's verdict finding that Defendant was in bad faith in its handling of Plaintiff's claim. As this court may not disturb a jury's finding of fact unless the record establishes that a factual, reasonable basis does not exist for the finding and the finding is clearly wrong or manifestly erroneous, this determination resolves the issue of the trial court's propriety in denying the motion for JNOV. *Joseph v. Broussard Rice Mill, Inc.*, 00-628 (La. 10/30/00), 772 So.2d 94.

An insurer, who arbitrarily, capriciously, or without probable cause fails to pay a claim within thirty days of receipt of satisfactory proof of loss, shall be cast with penalties in the amount of fifty percent of the amount due or $1,000.00, whichever is greater, as well as reasonable attorney fees. La.R.S. 22:1982(B)(1)(a). "A 'satisfactory proof of loss' is that which is sufficient to fully apprise the insurer of the insured's claim." *Harris v. Imperial Fire & Cas. Ins. Co.*, 20-1323, p. 8 (La.App. 1 Cir. 7/21/21), 328 So.3d 1208, 1215, *writ denied*, 21-1282 (La.

19

11/17/21), 327 So.3d 994. According to the supreme court, "'proof of loss' is a vehicle meant to advise an insurer of the facts of the claim and often takes the form of an estimate of damages prepared on behalf of the insured." *Katie Realty, Ltd. v. La. Citizens Prop. Ins. Corp.*, 12-588, p. 9 (La. 10/16/12), 100 So.3d 324, 330. As the supreme court has pointed out, there are no formal requirements regarding what constitutes proof of loss. *Id.*

> As long as the insurer obtains sufficient information to act on the claim, the manner in which it obtains the information is immaterial. *Sevier* [*v. U.S. Fid. & Guar. Co.*] , 497 So. 2d [1380,] 1384 [(La.1986)]. Thus, a satisfactory proof of loss occurs when the insurer has adequate knowledge of the loss. *Richardson* [*v. GEICO Indem. Co.*, 10-208 (La.App. 1 Cir. 9/10/10)], 48 So.3d [307,] 314. Whether and when a satisfactory proof of loss was received is a question of fact. *Id.*

*Harris*, 328 So.3d at 1216.

In *Louisiana Bag Co., Inc. v. Audubon Indemnity Co.*, 08-453, pp. 13–15 (La. 12/2/08), 999 So.2d 1104, 1114–15 (footnotes omitted), the supreme court expounded on what constitutes actions that are arbitrary, capricious, or without probable cause:

> Turning now to what is arbitrary, capricious or without probable cause, this court has previously stated in *Reed v. State Farm Auto. Ins. Co.*, 03-0107 (La.10/21/03), 857 So.2d 1012, that the New Oxford English American Dictionary defines an "arbitrary" act as one " 'based on random choice or personal whim, rather than reason or system,' " and capricious as " 'given to sudden and unaccountable changes in behavior.' " *Id.* at 1020. The phrase "arbitrary, capricious, or without probable cause" is synonymous with "vexatious," and a "vexatious refusal to pay" means "unjustified, without reasonable or probable cause or excuse." *Id.* at 1021. *See also La. Maint. Servs., Inc. v. Certain Underwriters at Lloyd's of London*, 616 So.2d 1250, 1253 (La.1993). Both phrases describe an insurer whose willful refusal of a claim is not based on a good-faith defense. *Reed*, 857 So.2d at 1021. *See also La. Maint.*, 616 So.2d at 1253.
>
> This court has also stated that penalties should be imposed only when the facts "negate probable cause for nonpayment." *Guillory v. Travelers Ins. Co.*, 294 So.2d 215, 217 (La.1974). *See also Crawford v. Al Smith P. & H. Serv., Inc.*, 352 So.2d 669, 673 (La.1977); *McDill v. Utica Mut. Ins. Co.*, 475 So.2d 1085, 1092 (La.1985). An insurer's conduct depends on the facts known to the insurer at the time of its

20

action, and this court has declined to assess penalties "when the insurer has a reasonable basis to defend the claim and acts in good-faith reliance on that defense." *Reed*, 857 So.2d at 1021 (citing *Block v. St. Paul Fire & Marine Ins. Co.*, 32,306 (La.App. 2 Cir. 9/22/99), 742 So.2d 746, 752, 754). Specifically, when there is a "reasonable and legitimate question as to the extent and causation of a claim, bad faith should not be inferred from an insurer's failure to pay within the statutory time limits when such reasonable doubts exist." *Id.* (citing *Block*, 742 So.2d at 752). In these instances, when there are substantial, reasonable and legitimate questions as to the extent of an insurer's liability or an insured's loss, failure to pay within the statutory time period is not arbitrary, capricious or without probable cause.

While an insurer need not tender payment for amounts that are reasonably in dispute, this court has explicitly found that "there can be *no good reason*"--or no probable cause--for withholding an undisputed amount. *Hammett v. Fire Ass'n of Philadelphia*, 181 La. 694, 160 So. 302, 304-05 (1935). Where there is a substantial, reasonable and legitimate dispute as to the extent or amount of the loss, the insurer can avoid the imposition of penalties *only* by unconditionally tendering the undisputed portion of the claim. *McDill*, 475 So.2d at 1091. *See also LeBlanc v. Underwriters at Lloyd's, London*, 402 So.2d 292, 300 (La.App. 3 Cir.1981). This court held in McDill that an insurer cannot "stonewall" an insured simply because the insured is unable to prove the exact extent of his damages. *McDill*, 475 So.2d at 1091. Where the exact extent of the damages is unclear, an insurer must tender the reasonable amount which is due. *Id.* We have defined the "amount that is due" as "a figure over which reasonable minds could not differ." *Id.* at 1092.

Defendant relied heavily on Plaintiff's prior and subsequent medical history in handling her UM claim, and the jury was presented with an abundance of evidence related thereto. Accordingly, a chronological examination of Plaintiff's entire medical history, as established through trial testimony and the extensive documentary exhibits introduced at trial, is essential to our consideration of Defendant's appeal.

Plaintiff, who had skied competitively from the age of four, crashed while training on January 23, 2005, landing on her head and shoulder. Cervical x-rays revealed a focal kyphosis at C4-5, with less than two millimeters of anterior subluxation of C4 on C5, but no facture or facet abnormality. Although the remaining pages of the emergency room report are missing, Plaintiff said that she

21

was diagnosed with a sprained neck, separated shoulder, and a concussion. She was referred by her treating orthopedic physician for a spinal consultation with Dr. David Verst.

On January 28, 2005, Dr. Verst, an orthopedic surgeon, diagnosed Plaintiff with cervical instability at C4-5 and recommended that she obtain a "[s]econd opinion before final treatment" of "[s]urgical intervention to include fusion C4-5[.]" He noted "[m]oderate paraspinal muscle spasm that is tender to palpation." It was his impression that the kyphosis revealed by the x-rays was caused by an old injury. X-rays taken that day revealed 15° kyphosis on lateral flexion and a four millimeter translation; a cervical MRI revealed no evidence of acute ligamentous injury. A month later, cervical x-rays revealed a mild cervical kyphotic deformity on flexion at C5, which was unchanged from the January 23, 2005 x-ray, and no significant subluxation. Muscle spasm was included as a differential conclusion for the findings.

On May 12, 2005, approximately three months post-accident, Plaintiff saw Dr. Tracey Busby, her family physician, for an upper respiratory infection. In her note, Dr. Busby stated:

> This 15 yr old female presents for [chest and back discomfort], has a cervical fx[6] from ski racing accident. Has been to see 5 MDs regarding possible surgery. [S]ome recommend fusion, some say it's stable, going to see Dr. Floyd next for opinion. Does get some stingers down both arms on occasion.

On June 22, 2005, five months post-accident, Plaintiff complained of numbness in her arms after running and wanted to recheck her acid reflux. Dr. Busby noted that Plaintiff's mother requested an order for a CT scan of her cervical spine:

> Was seen by Dr. Floyd (consult in chart) and again recommended surgery to allow sport participation. Father still refusing to consent to

---

[6] According to Plaintiff's medical records, she was never diagnosed with a fracture in her cervical spine.

22

surg based on neurosurg recommendation to observe (that opinion was reportedly given only from xr review, never examined or discussed w/pt). Mother has a neurosurgeon in LA who will see her and consult but he is requesting CT of cspine for better visualization of bones than available on MRI.

Dr. Busby noted that Plaintiff had neuropathy in both arms, mostly in the C7 distribution, which was worse with exercise. Her assessment was cervicalgia, neuropathy, and C4-5 instability. She encouraged Plaintiff to discuss the recommended surgery with her father, stating, "She needs the surgery, she needs to resume her life and the activities she loves." A cervical CT scan performed that day revealed a stable, mild kyphosis at C4-5, with no listhesis or slippage of the vertebra.

X-rays taken approximately one year after the accident revealed "[n]o acute findings with stable appearance to very mild focal kyphosis at C4-5 level." On August 18, 2006, Plaintiff was cleared to participate in all school sports. Cervical x-rays taken on March 8, 2007, revealed a stable, mild kyphosis at C4-5, with no listhesis during flexion or extension. On May 15, 2007, while clearing Plaintiff for right-knee surgery, Dr. Busby noted, "Ski accident 01/05 neck injury – C4/C5 ligament tear, discs slipped. Spent 9 months in neck brace." She noted that Plaintiff had full range of motion in her neck with extension, flexion, and lateral rotation.

On February 4, 2008, Plaintiff complained of bilateral soreness and swollen glands on the right side of her neck. Dr. Busby diagnosed neck strain. On February 13, 2008, Plaintiff complained of lower-back pain and "some L sided neck pain, mild tenderness to palp of the sternocleidomastoid insertion on L[.]" X-rays of her lumbar spine were normal.

Plaintiff crashed again while skiing on March 23, 2008. The emergency room records indicate that she complained of low back, neck, and left shoulder pain. An x-ray of her lumbar spine was normal. X-rays of her cervical spine revealed focal kyphosis distributed over the C4-5 and C5-6 disc levels, with anterolisthesis of one

23

millimeter at each level, similar to prior exams. A CT scan of her lumbar spine was normal. Plaintiff was diagnosed with a chip fracture of the L3 vertebra by Dr. Verst on May 5, 2008. He recommended physical therapy to stabilize her spine.

On May 7, 2008, Dr. Busby noted that Plaintiff "[h]ad another ski wreck in March and has a 'tear drop' fracture in back-being followed by Dr. Verst, on rest for now and will be starting PT soon, still has some pain w/palp over cervical process fracture site but not w/movement[.]" A July 17, 2008 lumbar MRI revealed mild disc desiccation at L3-4. Plaintiff was seen by Dr. Royce Pyette, a sports medicine physician with Bridger Orthopedic and Sports Medicine, on August 29, 2008. Dr. Pyette noted that Plaintiff complained "of lumbar pain after periods of prolonged ambulation or with lifting[]" following her March 23, 2008 crash. After reviewing the March 23, 2008 cervical x-rays and CT scan, as well as the July 17, 2008 lumbar MRI, Dr. Pyette felt that Plaintiff's cervical strain from the 2005 accident had resolved; that her lower-back pain from the L3 fracture had stabilized; and that she had mild disc desiccation at L3-4, without focal herniation. Based on Plaintiff's "stable and intact neurologic exam associated with her young age," he recommended "a conservative program to include core strengthening and stabilization and anti-inflammatories." He further noted:

> Alisa also presents with specific questions regarding ski racing. She has considered ski racing at MSU as a walk on athlete. I had a long discussion with this patient regarding her current symptoms, expected training at the NCAA level and NCAA guidelines. At this point, given her current symptoms, we have agreed that she will most likely take a redshirt year this year and attempt to walk on next season.[7] Both she and her mother are in agreement with this plan.

---

[7] In *Du Bois v. Board of Regents of University of Minnesota*, 987 F.3d 1199, 1201 n.2 (8th Cir. 2021) (citation omitted), the court stated, "As a NCAA student athlete, students may participate in ten semesters of college athletics, but may only compete in four academic years. The extra permitted year of participation without competition is often called a 'redshirt' year."

Dr. Pyette's November 25, 2008 note stated that Plaintiff was cleared to return to skiing "[b]ased on her history, physical exam which demonstrates a normal neurologic exam and most recent MRI as well as her level of activity[.]"

On April 4, 2009, Plaintiff hit her head when her skies caught on a rock as she skied off a fifteen-foot drop. She was seen at Montana State University's Student Health Service Walk-In Clinic (the MSU clinic) on April 6, 2009, complaining of headache and a stiff neck. She was diagnosed with post-concussive syndrome. A CT scan of the head was normal.

On June 15, 2009, Dr. Busby noted that Plaintiff had suffered another concussion while skiing, but that she was not racing due to back pain. On July 22, 2009, she referred Plaintiff to Dr. Kenneth Brait for a neurology consultation for her headaches. Dr. Brait diagnosed Plaintiff with post-concussion migraine syndrome due to her concussions from skiing. On March 17, 2010, Plaintiff, who was seeing Dr. Busby for sinus issues, complained that she was still experiencing back pain.

On May 6, 2010, Plaintiff underwent a physical at the MSU clinic as part of a visa application. In the associated questionnaire, Plaintiff gave a history of a teardrop fracture to her L3 vertebra and a ripped disc, as well as displaced discs at C4 and C5. The examining physician's note stated that Plaintiff has "[c]hronic back pain w/ hx Fx L3 and disc damage[,]" and noted "recurrent tingling extrem due to 'slipped discs in neck' decided not to do surgery, neck is 'stable[.]'"

On August 11, 2010, Dr. Verst noted that Plaintiff was still experiencing back pain and mild lower-extremity pain. He recommended an MRI of her lumbar spine. The August 12, 2010 MRI revealed a minimal annular disk bulge and mild desiccation at L3-L4, moderate degenerative changes to the facet joints at L4-5, and a mild annular disc bulge and superimposed left paracentral disc protrusion at L5-

25

S1, with mild narrowing of the left neural foramen. Dr. Verst diagnosed Plaintiff with discogenic pain on August 18, 2010, and recommended physical therapy.

On May 23, 2012, Dr. Busby noted that Plaintiff, who was seen for medication refills, "[h]as continued to have headaches, for 6 weeks felt like post-concussion headaches again, nothing helped, did not fall again. She has had 5 concussions ski racing, she did ski a little this year but did not race." On May 31, 2012, she noted that Plaintiff was "contemplating returning to ski racing. [H]as had 5 concussions. [H]ad a cervical fracture, mom not thrilled with this idea. [T]here is a club team at college." She further noted that Plaintiff had "some chronic back pain after ski racing with some bulging discs."

On February 25, 2013, Plaintiff, who was requesting blood work at the MSU clinic, stated that her back flared up one to two times a month, which interfered with exercise and skiing. The record noted Plaintiff's history of two herniated discs and that she had undergone physical therapy twice without obtaining much relief.

Following graduation, Plaintiff was hired as an associate technical professional by Halliburton. In a July 24, 2013 employment physical, she satisfied the criteria in the musculoskeletal screening test for a female in her age group. In the physical's questionnaire, Plaintiff identified her past injuries as a C4-5 displacement in 2005, and an L3 teardrop fracture and disc strain in 2008. She also checked that she previously or recently had experienced back pain, back injury, and back problem that limits work. However, next to these items, she wrote, "[O]ccasional pain no limits. [O]ccasional ibuprofen as needed." Plaintiff further stated that her activity level had been well above average the previous year; she experienced back pain/back problems in the last month; lifting, sitting, and bending made her back sore; she had previously undergone imaging studies of her back; her

26

legs and her back were the strongest and weakest parts of her body; and she last felt her best in 2008–2009, and her worst in 2005.

Plaintiff began working for Halliburton in Lafayette in August 2013. On November 4, 2013, while undergoing training in Dallas, she saw Dr. Kent Hamilton for acid reflux. In his questionnaire, Plaintiff said that running and the outdoors were her hobbies and that she had previously or was currently experiencing muscle and back pain, numbness or tingling, and severe headaches. On December 23, 2013, Plaintiff saw Dr. Busby while she was in Idaho, who noted that Plaintiff was working out five days a week and that she had started working for Halliburton on "offshore drilling exploration techniques. Likes it."

The accident at issue occurred on January 14, 2014, when Ms. Landry rear-ended Plaintiff as she slowed down behind a left-turning vehicle. In the accident report, Plaintiff stated:

> Driving down Southpark rd., the car in front of me slowed down to turn left. I slowed down + the car behind me rear ended me. We both pulled over to inspect the damage + I called the police. I had felt a big jolt + wearing my seatbelt got whipped.

Ms. Landry stated:

> I was traveling on Southpark + they had a car in front of 4 Runner + they did a sudden left turn and with tail light [sic] cover I could [sic] tell if she had stuck brake and as I began to slow down my bumper came into contact with her towing axel there was no damage other than on my truck + a little brushing of the paint on her bumper.

Plaintiff sought treatment at Our Lady of Lourdes Regional Medical Center shortly after the accident. She complained of moderate neck and lower back pain, as well as pain in the occipital region of her head. X-rays of the cervical spine revealed no abnormality, and x-rays of the lumbar spine revealed possible mild lower lumbar spondylosis. A CT scan of the head revealed a calcification within the

27

right sylvian fissure of unknown significance. Plaintiff was diagnosed with cervical and lumbar sprains and a head contusion.

Defendant's records indicate that Plaintiff left a message with the adjuster three days after the accident, stating that "she thinks she failed to tell [her] about her back issue."

Plaintiff saw Dr. Neil Romero, an orthopedic surgeon, on four occasions from February 24, 2014–June 4, 2014. On February 24, 2014, she complained of neck and back pain as a result of the accident, with pain radiating into her posterior shoulder and buttocks. Dr. Romero noted:

> She reports that she was involved in snow skiing accident at the age of 15. She injured her neck and her back at that time and was told that she most likely needed cervical spine surgery. She did physical therapy and her symptoms did get better. She reports that she really did not have much neck or back pain immediately preceding this motor vehicle collision but now her neck symptoms are rather severe followed by her back symptoms, as well as leg symptoms. She currently works as an engineer for Halliburton and presents today for evaluation. She has continued to work despite her symptoms.

He noted that her x-rays revealed a mild loss of lordosis, mainly at C4-5 and possibly at C5-6, which was regained with extension, as well as "no evidence of gross instability or advanced degenerative changes." Based on the severity of Plaintiff's accident and the severity of her symptoms and history, his initial diagnosis was severe cervical and lumbar strains. However, he also noted her lower extremity radiculopathy.

A February 25, 2014 cervical MRI revealed an extremely slight annular bulge at C4-5; a minimal annular bulge with a superimposed focal right paracentral disc protrusion with annular fissure at C5-6; and a mild annular bulge at C6-7. All three levels had minimal left uncinate[8] hypertrophy and foraminal stenosis. The lumbar

---

[8] Hook shaped.

MRI differed from Plaintiff's August 12, 2010 MRI in that it revealed mild bilateral hypertrophic facet arthrosis, with ligamentum flavum thickening and trefoil deformity of the thecal sac at L4-5, and the presence of an annular fissure at the disc protrusion at L5-S1. Based on these findings, Dr. Romero recommended physical therapy.

On March 11, 2014, Defendant's records indicate that a message was left asking Plaintiff to call the adjuster in regard to her med-pay claim. According to a March 19, 2014 invoice from John Wayne's Body and Paint Shop, Inc., the repairs to Plaintiff's vehicle cost $2,842.48, which included the replacement of the metal trailer hitch.

At Plaintiff's fourth and final appointment on June 4, 2014, Dr. Romero noted:

[Plaintiff] returns to see me today still complaining of neck and back issues. She has undergone an extensive amount of physical therapy with some temporary relief. Overall she feels like she is improved but she is not where she thinks she needs to be. She comes in today for re-evaluation. She denies bowel or bladder symptoms or constitutional symptoms, and once again, she wants to discuss being released to do water survival which she appears very hesitant to do.

Dr. Romero recommended that she be evaluated by Dr. Kevin Lasseigne, an interventional spine physician. He "assured her that [he did] not see anything from a surgical perspective on either her neck or her back at this time." He also cleared her to participate in water survival training after approval was obtained from her physical therapist. Dr. Romero stated:

I do not see anything from a structural or mechanical standpoint in her neck or her back that should limit her other than her perception of pain. I did explain this to her in great detail. I made her no reassurances with the fact that her pathology might not worsen, I just reassured her that at this time I do not see significant pathology on either her cervical or lumbar spine MRI. So, at this point we went ahead and cleared her to do water survival[.]

The training, which was required by Halliburton, consisted of the use of swing ropes in transferring from boat decks to platforms and vice versa; a sea survival module;

29

United States Coast Guard personal survival training; and helicopter underwater egress from a helicopter simulator. The last-three described activities involved swimming and treading water in full clothing; performing drills while wearing a life jacket; practicing different modes for entering and exiting water; donning an immersion suit in and out of water and climbing on an inverted raft and reverting it to the upright position; and exiting a submerged, flipped helicopter simulator by unclipping the seatbelt and swimming out of the window.

On June 9, 2014, Defendant's records indicate that a message was left for Plaintiff regarding her med-pay claim. The note stated that in the event Plaintiff did not contact the adjuster regarding this claim, her file would be closed at the end of May 2014. It further indicated that Plaintiff called later that day and told the adjuster "she is still going to PT for her injs and is going through [claimant carrier]. She said I can go ahead and close out the file. [S]he will let me know if something comes up[.]"

Plaintiff was treated by Dr. Lasseigne from June 18, 2014–November 3, 2015. On June 18, 2014, he noted her immediate onset of neck and lower back pain following the accident, and although she had a history of this type of pain, she was asymptomatic at the time of the accident. Dr. Lasseigne diagnosed Plaintiff with cervical pain related to C6 radiculitis and C5-6 disc herniation with annular fissure, and lumbar pain likely caused by bilateral S1 radiculitis and L5-S1 disc herniation with annular fissure. He initially treated Plaintiff with medication and physical therapy, referring her to Sellers Physical Therapy, LLC.

On August 18, 2014, Kevin Sellers noted Plaintiff's neck and back pain and that she was diagnosed with displaced C4-5 after a 2005 ski accident, after which she was in a neck brace for nine months and did physical therapy. She reported that her lumbar pain began after a 2008 ski accident, from which she suffered a teardrop

30

fracture of the L3 vertebra and a partial disc herniation. Plaintiff reported that her condition was okay until the January 14, 2014 accident, which "flared everything up."

Although Plaintiff reported that her overall condition had improved forty percent by October 7, 2014, Dr. Lasseigne noted that she plateaued thereafter, after which he administered bilateral S1 nerve-root injections on November 24, 2014, and May 8, 2015. These injections provided no pain relief to Plaintiff.

On December 30, 2014, Plaintiff filed suit against Ms. Landry, State Farm, and Defendant.

According to a job description, submitted for a December 1, 2015 medication review related to Plaintiff's use of prescription medication while working, Halliburton classified her position as very heavy, heavy, or medium duty. The position required her to work offshore and involved the handling of flammable or hazardous materials, the operation of cranes or forklifts, and the assemblage, installation, or repair of systems used under high pressure. The position also exposed Plaintiff to hazards caused by moving mechanical parts, electrical shock, burns or radiant energy from explosives, and toxic chemicals. Plaintiff was cleared to return to work on December 2, 2015, but was restricted from operating a forklift while taking the specific medication.

On January 28, 2015, Defendant's records indicate that Plaintiff filed an uninsured motorist suit and that Ms. Landry and State Farm were also named as tortfeasors. Defendant answered Plaintiff's suit on February 15, 2015.

On May 20, 2015, Dr. Lasseigne changed Plaintiff's medication and recommended a Pilates-based physical therapy. He further noted that "[i]n the event symptoms persists, we may have to consider a surgical consultation given that we have exhausted many conservative treatment options."

31

A July 22, 2015 lumbar MRI differed from the February 25, 2015 MRI in that it demonstrated a mild progression in the narrowing of the spinal canal and the thickening of the ligamentum flavum at L3-4. On August 4, 2015, Plaintiff complained of axial low back pain, which radiated into her legs, as well as neck and bilateral scapular region pain. Dr. Lasseigne's impression was unchanged except to note that Plaintiff had experienced some improvement with physical therapy, but none from the injections. He noted:

> At this point I do think we can go ahead and continue on with the physical therapy, as it is providing her some relief.
>
> We talked about where to go from here. I do not think injection therapy is the answer anymore for us going forward. I do think that surgery would likely end up in her having a fusion. However, I am not sure that this would be the case, as I am not a surgeon. However, given that she has greater back pain than she has leg pain I am concerned that this would be the case.
>
> We talked about PRP treatment into the disc. I did give her the name of Marco Bodor in Napa California. She will look into this. I will see her back in clinic in two months once she has looked into some of the treatment in terms of the PRP treatment and has had a chance to participate in therapy and we will consider going from what our options are at that point. In addition we did give her a prescription for Trezix today. We did consider trigger point injections next time she comes in the office for her neck.

On August 31, 2015, Plaintiff emailed copies of her medical bills, totaling $23,047.78, to Defendant for payment under her med-pay coverage.

On September 15, 2015, Dr. Lasseigne noted that Plaintiff's pain "comes and goes depending on her activity level." In addition to continuing her physical therapy, Dr. Lasseigne recommended a neurosurgical consultation with Dr. Dani Bidros for her lumbar issues.

Defendant tendered payment of $22,956.26 to Plaintiff on September 28, 2015, under her med-pay coverage. The accompanying letter stated that the difference between the amount presented and that tendered was due to "non-related

32

prescriptions from Walgreens and the difference in medical bills from Louisiana Orthopaedic Specialists."

On October 6, 2015, Dr. Bidros noted Plaintiff's persistent complaints of low back pain and pain radiating into her legs and feet. Plaintiff relayed that she had previously experienced low back pain following her 2008 ski accident, which had somewhat resolved. He further noted that physical therapy had provided her mobility, but not pain relief and that her pain had been aggravated by injections. After reviewing Plaintiff's lumbar MRI, Dr. Bidros found that her degenerative changes were "worst at L5-S1 with modic changes and disc bulging." He recommended that she undergo an anterior lumbar interbody fusion at L5-S1, which he thought "would give her reasonable chance for improvement though not guaranteed."

On November 3, 2015, Dr. Lasseigne noted that Plaintiff's lower back issues had not improved with therapy and that she was complaining of neck and right parascapular pain. In addition to a cervical MRI, he recommended that Plaintiff consider a total disc replacement at L5-S1. The findings of the December 4, 2015 cervical MRI were similar to the February 25, 2014 MRI, with the exception that the superimposed small disc protrusion at C5-6 was no longer present.

On December 15, 2015, Defendant tendered $2,043.74 to Plaintiff, which represented the remaining policy limits of her $25,000.00 med-pay coverage.

Plaintiff was laid off by Halliburton in March 2016.

Defendant received Ms. Landry's affidavit confirming that her insurance coverage through State Farm was the only coverage she had on her vehicle at the time of the January 14, 2014 accident.

On April 20, 2016, Defendant unconditionally tendered $20,518.26 to Plaintiff, its first UM tender. The accompanying letter stated:

33

According to my file, your client has $26,518.26 in related medical bills. She has complaints of back and neck pain after the accident. However, your client has a long history of back and neck injuries and has continued to work offshore and travel in the two plus years since the accident. She was even able to undergo the rigorous physical training required for her current job.

That being said, your client received medical treatment through November 2015, about 22 months post-accident. Accordingly, we have evaluated the claim at approximately $34,0000.00 plus medicals. This evaluation places total quantum at $60,518.26.

As you know, we receive a credit for the $15,000.00 underlying limits. Pursuant to Louisiana case law and our policy language, we also receive a credit for the $25,000.00 we have paid in med-pay benefits, for a total credit of $40,000.00. Accordingly, we hereby make this unconditional tender of $20,518.26 ($60,518.26 minus $40,000.00).

Please let me know if your client will accept this check in full and final settlement of her claims against my client or if she will continue with litigation. Either way, my client believes this is a very fair evaluation of the claim and we will not make any additional tenders, absent some new evidence that would warrant such.

On June 1, 2016, an order of partial dismissal was rendered by the trial court, dismissing Plaintiff's claims against Ms. Landry and State Farm.

On June 8, 2016, Plaintiff, who was unemployed and on Medicaid, was seen by Michael Schweid, a physician assistant to Dr. John Barker, a Denver, Colorado orthopedic surgeon. At the time, Plaintiff still lived in Louisiana, but planned to move to Denver. PA Schweid noted:

Ms. Durkheimer is a pleasant 26 year old female with cervical and low back pain. Her cervical pain started in January of 2005 after a ski accident. She states that she had ligament instability at C4-5. Her back pain started in March of 2008 and she reinjured it in January of 2014. At this time, she states her back pain is significantly more debilitating than her cervical pain. She denies any significant leg symptoms. She described her back pain as stabbing, stiff and muscle spasms. The pain is intermittent. She does have occasional radiation of her back pain into her legs. She has some subjective weakness associated with her pain.

He further stated:

Based upon her MRI there is no significant etiology for her pain. However, given the report of ligament . . . injury after a skiing accident flexion/extension films of cervical spine would be warranted to

34

evaluate for instability. Concerning her lumbar spine. It may be of help to her to have facet injections at L3-4 and L5-S1.

Plaintiff next saw PA Schweid on January 23, 2017, at which time her cervical pain was significantly worse than her lumbar pain. Although cervical x-rays revealed no subluxation or dynamic instability with flexion or extension, PA Schweid noted kyphosis at C4-5, with a slight anterolisthesis that was reduced with extension. He diagnosed Plaintiff with cervical spondylosis, cervical spondylolisthesis, and cervical kyphosis and recommended physical therapy and injections. Plaintiff was administered bilateral facet-joint injections at C4-5 on February 17, 2017, and at C5-6 on March 10, 2017, neither of which relieved her pain.

On March 6, 2017, Defendant tendered $3,891.73 to Plaintiff, its second UM tender. The accompanying letter stated:

> This additional tender represents the additional medical bills now documented in our file since the tender we made under cover letter dated April 20, 2016. Please let me know if your client will accept this check in full and final settlement of her claims against my client or if she will continue with litigation.

On April 5, 2017, Plaintiff saw Dr. Barker for the first time. He noted:

> This is a very pleasant 27-year-old female with a long history of neck pain. She was initially involved in a severe ski accident as a competitive ski racer in 2005. In the ski accident, she landed on her head and her right shoulder. She had a right a.c. joint separation and ligamentous damage to her neck. She was treated in a cervical collar for 9 months. She had extensive physical therapy after the period of immobilization and her neck pain was under fair control, but she still had some degree of neck pain and interscapular pain and trapezius pain. She was then involved in a severe motor vehicle accident in 2014 which was a high impact rear end collision. Since the motor vehicle accident, the patient has had severe and unrelenting pain, cervical-induced headaches as well as bilateral trapezius pain. She denies any radicular symptoms in her arms. She has noticed that when she works at a computer for extended periods of time that she has severe posterior pain.

35

Dr. Barker noted that Plaintiff's cervical x-rays revealed kyphosis with some disc space collapse at C4-5. An April 13, 2017 cervical MRI revealed mild reversal of cervical lordosis and mild right apical curvature of the lower cervical spine. It further revealed minimal posterior bone spurs and minimal hypertrophy of the uncovertebral joints at C4-5, C5-6, and C6-7, as well as minimal hypertrophy of the uncovertebral joints at C3-4 and C7-T1. On May 31, 2017, Dr. Barker diagnosed Plaintiff with cervical instability at C4-5 with kyphosis and functional stenosis. He noted:

> The MRI was negative for any adjacent level disease or severe disc herniations. The majority of her symptoms are coming from her cervical instability at C4-5. She has had the symptoms for 11 years and has failed extensive nonoperative management. We will plan on a C4-5 ACDF.

Dr. Barker performed an ACDF at C4-5 on June 30, 2017. Plaintiff also underwent bilateral lumbar facet joint injections on August 2, 2017, which failed to alleviate her pain.

On September 14, 2017, Defendant tendered an additional $30,000.00 to Plaintiff on her UM claim, its third UM tender. The accompanying letter stated:

> Since our last tender, it appears your client has incurred approximately an additional $14,000.00 in medical bills. Even though it is questionable that these bills are even related to the subject accident, we have considered them as part of this tender. In addition, since our first tender, your client has treated for an additional 16 months, from November 2015 to March 2017. Accordingly, included with this tender is an additional $16,000.00 in general damages.

On October 2, 2017, PA Schweid cleared Plaintiff for yoga and exercise, and restricted her to lifting no more than twenty pounds and from performing squats or any activity that would strain the cervical spine. He further noted that Plaintiff had fallen that day while dog sitting, but that she denied arm pain or a significant increase in her neck pain due to the fall.

36

On October 27, 2017, Plaintiff was examined by Defendant's expert, Dr. Henry J. Roth, an internist. After reviewing her medical records from December 1989–March 2017, and the depositions of Plaintiff, Mr. Sellers, Dr. Romero, Dr. Lasseigne, and Ms. Landry, Dr. Roth issued opinions related to Plaintiff's accident-related claims. While he could not rule out that the accident caused a cervical strain, he opined that Plaintiff's lower back complaints immediately after the accident were not medically probable, that her cervical and lumbar spine pathologies were not accident-related, and she had no residual symptoms related to the accident.

As to her medical status following the accident, Dr. Roth opined that Plaintiff should have recovered from the cervical sprain by June 2014, and he related her ongoing cervical and lumbar issues to her unresolved ski injuries as reflected in her 2005 and 2008-2010 medical records. However, Dr. Roth noted that the absence of medical records documenting treatment for these issues between 2009–2014, supported Plaintiff's claim that she was asymptomatic prior to the accident. He further opined that Plaintiff's subjective complaints of pain were consistent with a medically probable somatic symptom disorder.

On January 17, 2018, Plaintiff complained to PA Schweid of increased neck and lower-back pain, caused, in part, from yoga.

On May 21, 2018, Plaintiff saw Dr. Sanjay Jatana, an orthopedic surgeon. Noting her complaints of recurrent cervical and lumbar pain, with referred pain into her lower extremities, he stated:

> She sustained a motor vehicle accident in 2014 in Louisiana. She was rear-ended at about 40-50 miles per hour. Her past medical history as a biomedical engineer is significant in that she had an initial ski accident in 2005. She initially got better with conservative treatment and was doing well until she sustained the motor vehicle accident in 2014. She was essentially asymptomatic and was not having any significant treatment based on her history until this motor vehicle accident in 2014, so she was completely recovered from the 2005 injury.

37

Dr. Jatana recommended bilateral C5-6 facet-joint injections and thoracic and lumbar MRIs. In diagnosing Plaintiff with cervicalgia, disc degeneration at C5-6, dorsopathies in the thoracic region, and intervertebral disc degeneration in the thoracic and lumbosacral regions, he stated:

> Due to the fact that she has had recurrent symptoms within one year of her cervical surgery, suggests that maybe this level was part of the pain process and now has surfaced due to it being next to a fusion. . . . We discussed radiofrequency ablation as an option, cervical discography for diagnostic testing, and future treatment options.

On July 9, 2018, Defendant amended its answer to allege, as an affirmative defense, the sudden emergency doctrine. On December 14, 2018, Plaintiff amended her suit to allege Defendant's bad faith.

On October 17, 2018, Dr. Jatana noted that although Plaintiff's symptoms had improved somewhat with physical therapy, her pain had not improved. He further noted that she "had a recent fall down stairs on 10/14/18 which has aggravated her symptoms. Her symptom description is essentially the same as it was prior." Dr. Jatana noted that Plaintiff's lumbar MRI was "consistent with a degenerative tear and annular tear with a disc protrusion at L5-S1[,]" while her thoracic MRI revealed mild, but not significant, degenerative changes. Dr. Jatana's assessment at that time was disc degeneration at C5-6 and intervertebral disc displacement in the lumbosacral region. He recommended bilateral transforaminal injections at C5-6 and L5-S1.

On January 7, 2019, Plaintiff emailed an updated medical expense summary to Defendant, including copies of her medical bills through October 17, 2018, totaling $152,193.68.

On January 14, 2019, Dr. Jatana, after noting that Plaintiff had gained no relief from the injections, recommended a C3-4, C5-6, and C6-7 discogram to determine which disc was the cause of her ongoing cervical pain. The January 31, 2019

38

discogram revealed "[d]efinite discogenic pain at C5-6 with right posterolateral annular tear."

On March 12, 2019, Plaintiff sent Defendant a follow-up to her January 7, 2019 email.

On May 13, 2019, based on Plaintiff's age and single-level problem, Dr. Jatana recommended that she undergo an anterior cervical discectomy and disc arthroplasty at C5-6, to replace the C5-6 disc with an artificial disc. He noted that the transforaminal injections at C5-6 administered on November 8, 2018, provided Plaintiff with only temporary relief. On May 29, 2019, he noted that "[a] new cervical MRI is consistent with a degenerative disc with stenosis at C5-C6 with right severe stenosis in the foramen." On June 12, 2019, Dr. Jatana noted that Plaintiff's health insurer had denied the surgery. On July 3, 2019, he again noted that the surgery was the best option for Plaintiff based on her age, and he recommended a "third level appeal" with Plaintiff's health insurer, if possible. In the meantime, he recommended a repeat course of physical therapy and to consider an intralaminar epidural steroidal injection.

On August 7, 2019, Plaintiff informed Defendant that she was "preparing for her second neck surgery." Attached to the email were surgical estimates related to the anterior cervical discectomy and arthroplasty at C5-6, totaling $11,388.00.

On September 16, 2019, Dr. Jatana noted Plaintiff's worsening neck, upper back, and upper extremity pain. He further noted that she wished to proceed with an ACDF at C5-6. After obtaining Plaintiff's consent, Dr. Jatana performed the surgery on December 13, 2019.

On January 10, 2020, Defendant moved for summary judgment on the issue of bad faith.

During Ms. Henschel's January 31, 2020 deposition, Defendant's counsel acknowledged that she had received, and submitted to Defendant, Plaintiff's updated medicals. She further acknowledged that Defendant was aware of Plaintiff's December 13, 2019 surgery.

On February 18, 2020, an email from Plaintiff to Defendant stated, "On January 10, 2020, we sent you updated medicals from Dr. Sanjay Jatana, M.D. regarding the recently performed second cervical [discectomy] and fusion at Rose Medical Center. Today, we received the bills from Rose Medical Center, including pre-op and for overnight observation."

At the conclusion of the February 26, 2020 summary-judgment hearing, Defendant orally moved for permission to add a medical expert to its pre-trial witness list since Dr. Roth had been diagnosed with cancer. The trial court granted Defendant's motion.

*Trial Testimony*

The testimony introduced at trial is summarized as follows in the order it was presented to the jury:

Plaintiff, who skied competitively for fifteen years, stated that she suffered two major crashes and five major concussions while skiing. Her first major crash occurred on January 23, 2005, when she fell and landed on her head and shoulders and was diagnosed with a separated shoulder, a sprained neck, and a concussion.[9] The multiple doctors she saw after this accident were divided on the treatment she should receive. Some recommended that she undergo surgery to fuse her neck because of potentially instability, while others opined that she did not require surgery because her neck was stable. Plaintiff stated that her parents were going through a

---

[9] Plaintiff was fifteen-years old.

divorce and could not agree on her treatment. She said that she was eventually treated by a Dr. Johnson in California, who recommended that she give her neck time to heal by wearing a neck brace. She said after wearing a neck brace for nine months and undergoing therapy, she was cleared to ski approximately one year later.

Plaintiff's second major crash occurred on March 23, 2008, after which she was diagnosed with a fracture of her L3 vertebra, a ruptured disc, a concussion, and strained hip flexor and groin muscles. Although she acknowledged that she experienced some neck pain after this accident, she said that it quickly resolved. Plaintiff testified that no surgery was recommended following this accident, and her lumbar injury stabilized over time. She said that while she occasionally suffered lower back pain following this injury from using improper lifting techniques or lifting heavy objects, her pain quickly resolved with ibuprofen.

Plaintiff testified that she received no treatment for neck pain between 2008 and 2013, and that she remained active while in college by working and participating in outdoor activities such as skiing, hiking, backpacking, camping, kayaking, and running, as evidenced by photographs introduced into evidence. These showed Plaintiff biking along a beach in 2009; backpacking during a three-day backpacking trip in 2010, during which she carried a fifty-pound backpack, slept on the ground, and free-climbed on the side of a mountain; white-water rafting and backpacking in 2011; working on water and sanitation projects in Kenya for six weeks and three months in 2010 and 2013, respectively, and climbing to the top of Mount Kilimanjaro in 2013; and running in a 10-K race and skiing in 2013. Plaintiff also studied in Spain for one semester during college.

Plaintiff testified that she suffered a concussion while skiing on April 4, 2009, when she fell on her head. Although she also complained of a stiff neck, she stated that the treatment she received was for her concussion.

41

Plaintiff testified that after being conditionally hired by Halliburton, she easily satisfied the musculoskeletal portion of the employment physical on July 24, 2013. She stated that in the questionnaire, she noted that she had suffered a C4 and C5 displacement in 2005, and a L3 teardrop fracture and disc strain in 2008. While admitting that she checked boxes for back pain, back injury, and back problem that limits work, she qualified these entries by writing that she was not restricted by her occasional back pain and that she took ibuprofen as needed. Plaintiff further pointed out that her activity level the previous year had been above average. She maintained that she would not have accepted Halliburton's job offer if she had been physically limited by her neck and lower back.

Plaintiff testified that after starting with Halliburton in August 2013, she completed a one-month orientation in Lafayette and a three-month training program in Dallas, including time spent on a simulation rig. She returned to Lafayette on January 4, 2014. Regarding the accident, she stated that the impact caused her head to slam forwards and then backwards into the headrest. She said that she experienced immediate pain in her head, neck, upper shoulders, and lower back, and was diagnosed with a head contusion and neck and back strains. Repairs to her vehicle cost $2,842.48.

After taking three days off, Plaintiff testified that she continued working despite experiencing unrelenting pain, which was not alleviated by ibuprofen, ice, or heat. She stated that she was initially treated by Dr. Romero, who treated her with physical therapy. She was then treated by Dr. Lasseigne, who treated her with physical therapy, injections, and medication and restricted her from lifting over ten pounds. She stated that the medication did not relieve her pain. Dr. Lasseigne referred her to Dr. Bidros, who recommended that she undergo fusions in her lower back.

42

Plaintiff testified that she informed both Dr. Romero and Dr. Lasseigne about her prior neck and back injuries. She admitted that she did not tell Dr. Romero that her neck was rendered unstable by the 2005 ski accident, but only because she had recovered from the accident, was cleared to return to skiing approximately one year later, and had, in fact, continued to ski competitively.

Plaintiff denied that she reinjured herself while undergoing the water-survival training required by Halliburton. She stated that while she was hesitant to do the training, Dr. Romero thought she would be okay and cleared her to participate. She also denied that the training was rigorous or traumatic. She said that while she successfully completed the training, she was very sore afterwards, but that her pain returned to baseline a few days later.

Plaintiff testified that she moved to Denver in July 2016, after she was laid off in March 2016. She acknowledged that she was involved in a second motor vehicle accident in November 2016, but testified that she was only slightly sore after the incident, which resolved in less than a week. She testified that it cost $3,032.83 to repair her vehicle after this incident.

Plaintiff testified that she began seeing Dr. Barker, who told her at the time that conservative treatment would not help and recommended that she undergo an ACDF at C4-5. She underwent injections prior to the surgery as required by Medicaid, but they provided no pain relief. She consented to the surgery because of her increased pain, and while the June 30, 2017 surgery initially provided some relief, her pain returned to its post-accident level after she was cleared for and tried yoga. She admitted that she told PA Schweid that she tripped and fell while walking a dog on October 2, 2017, but stated that this incident did not worsen her condition.

Plaintiff testified that she began seeing Dr. Jatana in May 2018, after she was employed and on health insurance. He recommended cervical injections, which only

43

increased her pain. She also acknowledged that on October 17, 2018, she told Dr. Jatana that she had slipped and fallen while on stairs. She explained that she mostly fell on her elbow and that any pain caused by the fall had resolved within a day.

Dr. Jatana recommended an anterior cervical discectomy and C5-6 arthroplasty after a discogram determined that it was the cause of her pain. Plaintiff explained that he recommended the arthroplasty in order to limit her need for future fusions. She claimed that after the surgery was denied by her health insurer, she obtained cost estimates and had her counsel reach out to Defendant in August or September 2019, regarding the possibility of settling her UM claim. She stated that when Defendant failed to respond to this request, Dr. Jatana performed an ACDF at C5-6 on December 13, 2019.

Although she was experiencing no pain before the January 14, 2014 accident, Plaintiff testified that she experienced an immediate onset of constant, ongoing pain thereafter. Despite her pain, she continued working until she was laid off by Halliburton. She tried to continue her pre-accident activities, such as exercising, jogging, and kayaking, but was unable to engage or participate as before the accident. She attempted to ski in Idaho in December 2014, but had to stop after two runs because of pain. She attempted to ski on March 17, 2017, before her first surgery because she did not know if she would be able to ski again afterwards. She admitted that she hiked a 14,000-foot mountain in Colorado, called a fourteener, but that she drove up 10,000 to 12,000 feet before hiking to the summit on a trail that varied in difficulty, during which she carried no weight.

Plaintiff acknowledged that she submitted no medical bills to Defendant until after she was represented by counsel, stating that during that time she was focused on getting better. She denied telling the adjuster to close her med-pay claim on April 9, 2014, stating she would not have closed her claim as she was still undergoing

44

physical therapy for her injuries. Any discussion about closing the claim may have referred to her property claim as she was relying on State Farm to repair her vehicle.

It was Dr. Romero's opinion that the January 14, 2014 accident caused Plaintiff's symptoms. Dr. Romero testified that Plaintiff informed him that she had injured her neck and back skiing in 2005, for which surgery was recommended but not performed, and that her symptoms had improved with physical therapy. She told him that she was experiencing no significant neck or back pain prior to the accident, and she related her current symptoms to the accident. Dr. Romero found Plaintiff to be credible in reporting her complaints and prior history, and he saw no evidence that she exaggerated her complaints.

Dr. Romero agreed that the emergency room diagnosis was initially indicative of a soft-tissue injury, a typical presentation immediately after an accident, but he stated that Plaintiff's condition had evolved by the time he saw her one month after the accident. However, he stated that her condition had become chronic by the time he referred her to Dr. Lasseigne in June 2014. He explained that he did not recommend that she undergo surgery because conservative treatment options were still available.

Dr. Romero testified that Plaintiff's cervical x-rays revealed a mild loss of lordosis at C4-5 and C5-6, but no instability. He stated that kyphosis is an incorrect curvature of the spine, whereas instability is an abnormal motion of the spine, usually 3.5 millimeters or greater, as established through flexion and extension x-rays. He further testified that a finding of kyphosis does not require a concurrent finding of cervical instability.

Based on Plaintiff's x-rays, Dr. Romero believed that the 2005 diagnosis of instability was incorrect. He also believed that the surgical recommendation was incorrect based on her recovery without the surgery. He would not have

45

recommended surgery based on a diagnosis of mild kyphosis, especially if the patient was asymptomatic. He disagreed that Plaintiff was a surgical candidate prior to this accident as she was asymptomatic and her flexion and extension x-rays revealed no evidence of instability even though her cervical MRI revealed disc bulging at three levels.

Dr. Romero testified on cross examination that whether Plaintiff suffered an aggravation of or simply a continuation of her prior cervical injury depended on her symptoms before and after the accident. However, he stated that she told him that her symptoms had improved following the 2005 accident, and her x-rays following the motor vehicle accident revealed no cervical instability. He further stated that her 2005 cervical MRI was essentially negative, while her February 25, 2014 MRI revealed bulging discs at C4-5, C5-6, and C6-7.

Dr. Romero stated that Plaintiff's pre-accident statement, of taking ibuprofen for occasional back pain, was consistent with the history she related of not experiencing significant symptoms prior to the accident. He also said that the photographs introduced into evidence were consistent with her history of being very active between 2010–2013. When questioned about complaints made by Plaintiff on ten occasions between March 2008–February 2013, Dr. Romero said they could be consistent with her post-accident lumbar complaints. He agreed that the degenerative changes at L3-4, L4-5, and L5-S1 predated the accident, except that in addition to the disc bulge and disc protrusion at L5-S1, she now had an annular fissure. Dr. Romero described an annular fissure as a tear or a defect in the back of the disc.

While he had not placed any restrictions on Plaintiff during her treatment, Dr. Romero responded that he would simply have recommended that she let pain guide her activity level. He said that he advises his patients to stay active and to live their

46

lives. When asked whether Plaintiff's actions of running and exercising indicated that her soft-tissue injury had resolved, he said that it depended on whether she experienced symptoms during those activities. When pressed, Dr. Romero agreed that it was not unreasonable for Defendant to think that Plaintiff's cervical instability was caused by her November 2016 accident based Dr. Barker's diagnosis of cervical instability since her 2014 x-rays demonstrated no instability.

Dr. Romero did not offer an opinion on whether Plaintiff's subsequent surgeries were related to the January 14, 2014 accident, as that determination hinged on whether there were changes in her subsequent imaging studies and symptoms. He did not agree or disagree with Dr. Roth's suggestion that Plaintiff suffered from a somatic symptom disorder. While this could be a reasonable explanation for Plaintiff's pain, he reiterated that he found no evidence that she exaggerated her symptoms.

While deferring to Dr. Romero's opinion on causation, Dr. Lasseigne related Plaintiff's symptoms to the January 14, 2014 accident. Based on her oral history, she was asymptomatic before the accident, and he found her to be credible in relating her symptoms. He recalled treating Plaintiff because her last name was unique and because she skied, was from Idaho, and went to school in Montana. He also remembered her because of her age and her job with Halliburton. Dr. Lasseigne testified that Plaintiff told him about her prior neck injury from skiing. While he admitted that she did not explain the extent of her injury, he stated that he asked her a lot of questions about her skiing history, and he was aware that she had suffered a significant injury while doing a jump.

Dr. Lasseigne testified that throughout her treatment, Plaintiff consistently complained of neck, shoulder, and lower back pain, with pain radiating into her upper and lower extremities, which he found to be consistent with her imaging

47

studies. He stated that when he saw Plaintiff five months after the accident, she was way past a soft-tissue injury, which would have resolved within two to four months. Dr. Lasseigne stated that because he had exhausted all conservative treatment options by the end of her treatment, he referred her to Dr. Bidros, a neurosurgeon, who recommended that she undergo an anterior lumbar interbody fusion at L5-S1.

Dr. Lasseigne opined that Plaintiff's cervical complaints originated from the C5-6 disc, which, he explained, causes symptoms down the arm and into the ring and little fingers and the thumb. He stated that symptoms caused by the C4-5 disc stops at the elbow. He further opined that her L5-S1 herniated disc was the cause of her posterior thigh and calf pain, which was consistent with the S1 dermatome. He stated that Plaintiff's December 4, 2015 cervical MRI revealed that the disc protrusion at C5-6 had improved, but that she still had degeneration at C5-6 and foraminal stenosis at C4-5.

Dr. Lasseigne described Plaintiff's pain in her neck, shoulder blade, arms, lower back, and leg as radiculitis, which is neuropathic in nature. He explained that radiculitis occurs when a nerve root becomes chemically irritated by nucleus pulposus[10] leaking from a disc, which can cause very high levels of pain. Although Dr. Lasseigne agreed that a chemical irritation can also lead to radiculopathy, he stated that it differs from radiculitis in that it causes objective neurological deficits, such as muscle weakness and reflex and sensory changes, none of which Plaintiff demonstrated. He opined that Plaintiff's subjective complaints of pain perfectly correlated to a chemical irritation of the C5-6 and S1 nerve roots, caused by the leakage of nucleus pulposus through the annular fissures located at C5-6 and L5-S1.

---

[10] The jelly-like material located in a disc.

Dr. Lasseigne further opined that the flare-ups Plaintiff experienced in her lower back within six months of the accident were intermittent; thus, they were not the result of a chronic condition. He explained that a condition is chronic "when a person requires ongoing, routine, daily, every day [sic] kind of treatment." He pointed out that during the entirety of his and Dr. Romero's treatment, Plaintiff was never asymptomatic.

Laura Durkheimer testified that Plaintiff, her younger sister, was very active and loved outdoors activities prior to the accident. She stated that they often hiked, travelled, skied, and engaged in strenuous outdoor activities. She explained that she and Plaintiff were raised with a "go-gettem attitude" and that growing up as ski racers, they both had to be tough and fight through pain. Ms. Durkheimer said that she stayed in constant touch with Plaintiff after the January 14, 2014 accident and that Plaintiff was in a lot of pain during her April 2014 visit to Lafayette. While helping Plaintiff move to Denver, she did the majority of the driving during the trip and unloaded Plaintiff's U-Haul trailer when they arrived, as Plaintiff was in pain the entire trip. She also accompanied Plaintiff to many of her doctor's appointments after her move. Ms. Durkheimer testified that although Plaintiff's condition had been severely limited since the accident, she tried to continue her pre-accident activities. However, she stated that Plaintiff was unable to run or jog and that she even found long walks challenging.

Dr. Barker, who did not provide a causation opinion, testified that the majority of Plaintiff's symptoms and the reason he recommended surgery was based on the instability at C4-5. As to causation, he said that his only concern was that her instability had become so symptomatic that she now required surgery. While aware that Plaintiff was diagnosed with ligamentous instability following her 2005 ski

49

accident, Dr. Barker testified that "evidently it wasn't bad enough for her to have surgery because she never did have surgery."

Dr. Barker explained that prior to recommending surgery, he wants to know how long the patient has been experiencing symptoms and whether they have undergone adequate non-operative care for approximately three to six months. He said that he would not perform surgery on a patient one month post-accident unless they suffered from a gross instability that threatened paralysis. He further stated that a patient could be rendered more fragile by a prior injury, with a subsequent injury making a prior ligamentous instability worse or causing a degenerative disc to degenerate faster.

Dr. Barker testified that his pre-operative diagnosis was cervical kyphosis, instability, and foraminal stenosis at C4-5, and he performed an ACDF at C4-5 to relieve Plaintiff's neck pain and to correct the instability caused by the kyphosis. He described the lumbar facet arthropathy diagnosed by PA Schweid as a degenerative condition that would not spontaneously heal. While he agreed that skiing, hiking, and mountain climbing can sometimes exacerbate or accelerate the degenerative process, he stated that walking or the normal activities of daily living can also exacerbate or accelerate the process. He said that everything furthers the degenerative process.

Dr. Barker testified that Plaintiff told him that she was symptomatic prior to the January 14, 2014 accident, but that her symptoms were under fair control. In regard to her 2013 statement of occasional back pain, he understood this to mean that her symptoms were not that bad. He stated that Plaintiff was very active following her ski accidents, but that following this accident, she developed markedly more severe symptoms in the form of unrelenting neck pain, cervical-induced headaches, and bilateral trapezius pain. Dr. Barker said that while he was not

50

informed about Plaintiff's November 2016 accident, she informed PA Schweid about her October 2, 2017 fall. He opined that this incident did not aggravate her low back pain.

Dr. Jatana also did not provide a causation opinion, instead, deferring that question to the doctors treating Plaintiff closer in time to the accident. He further refused to offer an opinion on whether Plaintiff's kyphosis resulted from her 2005 ski. Because he only saw Plaintiff in regard to her complaints of pain following her first surgery, the only information he had was her March 2018 cervical MRI report showing that she had undergone a fusion. Dr. Jatana testified that Plaintiff told him that she was involved in a 2005 ski accident, but he admitted that she did not disclose the extent of her injury, the surgical recommendation, or her 2008 ski accident.

Based on the discogram results, Dr. Jatana determined that Plaintiff's continuing cervical pain was related to the C5-6 disc, either due to adjacent segment degeneration or because it was already symptomatic before the C4-5 fusion. He explained that a healthy adjacent disc degenerates at a rate of two to three percent a year from trying to compensate for the fused disc's lack of mobility, whereas a disc that is already injured degenerates faster and becomes symptomatic sooner. Thus, Dr. Jatana opined, if an adjacent disc becomes symptomatic within one year of a fusion, as in the case of Plaintiff's C5-6 disc, there is indirect evidence that the adjacent disc was symptomatic prior to the fusion.

Dr. Jatana testified that his pre- and post-operative diagnosis was a degenerative C5-6 disc; however, he explained that because this was the only medical term available to describe Plaintiff's disc, the degenerative finding was not necessarily age-related. Dr. Jatana stated that based on Plaintiff's imaging studies, this finding applied to both the cervical and lumbar spines. In regard to her lumbar complaints, Dr. Jatana diagnosed her with mechanical low back pain, which was

51

probably caused by her L5-S1 disc. He stated that she was receiving conservative treatment for this issue.

Dr. Jatana testified that Plaintiff's February 25, 2014 cervical MRI demonstrated that she had "structural changes consistent either with degeneration or trauma to the 5-6 level." He described an annular fissure as a tear in a disc's outer layer as a result of either the natural aging process or trauma. He testified that kyphosis is an x-ray finding, which describes a forward curve that changes the cervical spine's normal alignment as a result of either trauma or the degenerative process. Dr. Jatana further testified that while kyphosis, in and of itself, does not require treatment, any treatment prescribed would relate to the patient's symptoms. He stated that surgery is not recommended for an asymptomatic patient, and kyphosis usually does not reverse with physical therapy. He said that in treating ski-related injuries, he finds that his younger patients do better with kyphosis than his older patients.

John Wayne Prejean, the owner of the automotive body shop that repaired Plaintiff's 2000 Toyota 4Runner S45, testified that the repairs totaled $2,842.48. He stated that the repairs included replacing the rear gate, the bumper, the bumper extensions, the four brackets holding the bumper and bumper extensions, and the trailer hitch. He said that the trailer hitch was replaced for liability reasons due to the possibility that the spot welds used to construct it had cracked during impact. He explained that the heavy-duty after-market trailer hitch was hit first and bore the brunt of the impact.

Ms. Henschel testified that based on the initial information gathered by Defendant, Plaintiff's claim arose as a result of a minor accident as the accident report indicated that there were no complaints of injuries, no emergency treatment provided, and minor property damage and because Ms. Landry described the

52

accident as a "minor tap." Additionally, Plaintiff related in her recorded statement, taken two days after the accident, that she sometimes experienced neck pain. Ms. Henschel further stated that Defendant initially did not think Plaintiff was making a UM claim since she told the adjuster to close her file in April 2014, and the emergency room records indicated that she was only diagnosed with a spinal strain. She additionally noted that Dr. Romero found no objective sign of injury and did not recommend surgery.

Ms. Henschel stated that Defendant first learned about Plaintiff's UM claim when she filed suit on December 30, 2014. From that point onwards, she said, Defendant was defending against a lawsuit. She stated that Defendant began reviewing Plaintiff's past medical records because, as she stated, "in my experience, this type of accident doesn't normally correlate with any kind of big injury so we naturally want to look at whether or not something was wrong before and so, yes, we look at past records."

As part of its defense, Defendant hired Dr. Roth, an internist, who opined that the accident caused a temporary aggravation of Plaintiff's preexisting injuries, which had completely resolved by June 2014, even though she continued experiencing non-accident-related issues with her spine. She claimed that a red flag was raised by Dr. Roth's report by the inconsistencies and omissions noted in Plaintiff's reporting of her prior medical history to her doctors. She asserted that Plaintiff failed to provide Dr. Barker and Dr. Jatana with thorough histories of her prior injuries and treatment, and that her reported complaints, as well as Drs. Barker and Jatana's findings, were consistent with her preexisting injuries. Thus, she claimed that Defendant appropriately relied on Dr. Roth's opinion in finding that Plaintiff's complaints were related to her preexisting injuries. However, when asked, "Do you believe it's a fair statement that [Plaintiff] is required to reveal all of that information to every medical

53

provider every time she sees someone for her injuries[,]" Ms. Henschel answered, "Of course not." She also acknowledged that Plaintiff's report of her November 2016 accident and her 2017 and 2018 falls did not strike her as being dishonest.

Ms. Henschel testified that Defendant's reliance on Dr. Roth's opinion was also valid because neither Dr. Barker nor Dr. Jatana provided opinions relating Plaintiff's surgeries to the accident. However, she acknowledged that they did relate the surgeries to her symptoms. She said that Dr. Barker noted that the C4-5 fusion was the same surgery recommended to Plaintiff in 2005, and he testified that Plaintiff, herself, related her symptoms and her long history of neck pain to her 2005 ski accident. She further pointed out that Dr. Barker recommended surgery based on Plaintiff's failed history of significant conservative treatment. Ms. Henschel further testified that Dr. Jatana's recommended C5-6 fusion was based on degenerative changes that were present in Plaintiff's cervical spine dating back to 2005. She said that in her experience, degenerative changes do not get better. She further claimed that Dr. Jatana testified that Plaintiff had a preexisting cervical instability and disc injury at C4-5 that had not resolved. She also maintained that Plaintiff's diagnostic and surgical findings of kyphosis and other mechanical injuries were identical to diagnostic findings noted in 2005.

Despite Dr. Roth's note of chronic back pain in Plaintiff's 2010 and 2013 physicals, Ms. Henschel admitted that Defendant was not aware of any treatment received by Plaintiff for her neck and back issues in the eighteen months preceding the accident. She further admitted that there were no medical records documenting that Plaintiff complained of such pain between 2009–2010 and the date of the accident. She also acknowledged that the medical records indicated that Plaintiff was working out five days a week approximately one month before the accident; she traveled to Africa and climbed to the top of Mount Kilimanjaro in the summer of

54

2013; that she was running twenty-five miles a week in October 2011; and she had contemplated a return to ski racing in August 2010.

It was Ms. Henschel's opinion that Plaintiff's cervical and lumbar issues preexisted the accident based on the 2005 ski accident and the note of chronic back pain in the July 2013 physical. She further opined that Plaintiff's 2005 structural injury would never go away. Regarding whether Plaintiff complained of chronic symptoms in the eighteen months prior to the accident, Ms. Henschel testified, "I read chronic. And when I think of chronic, you have pain on and off. It waxes and wains [sic]. You know, I've got a bad back and it bothers me at different times. . . . And it has for years." While Plaintiff had not received medical treatment in the eighteen months preceding the accident, Ms. Henschel admitted that she received consistent, significant treatment following the accident. She further admitted that no medical record indicated that Plaintiff experienced a complete cessation of pain after the accident; however, she claimed, "I have no record that shows that she recovered from 2005."

Ms. Henschel additionally claimed that Plaintiff's ongoing pain following the accident was related to "much more significant" incidents. She stated:

> [S]he had all kinds of things that happened. A more significant car accident. You know, downhill skiing, survival training.
>
> All kinds of things happened. So when you asked me did she completely recover from this one instance, I believe she did, but was she recovered? No. You know she's not going to ever have a –
>
> . . . .
>
> She has structural injuries.

She further contended that these activities also contradicted Plaintiff's claim of debilitating pain:

> Well, I know she was - - the year of the accident she was kayaking and mountain hiking and downhill skiing, and not just the

55

blues or the greens, but all the ski hills, so she – and survival training. Dropped upside down, I think in a helicopter, simulation cockpit, had to push out a window, swim with her clothes on, tread water. All of these kinds of things she was doing, yes, after our accident that same year.

Ms. Henschel testified that its accident-reconstruction expert, Mr. Bogges, determined that the forces exerted on Plaintiff's spine "as a result of this relatively low impact accident wouldn't have been any more than activities of daily living." He further opined that the acceleration caused by the impact would not "exceed any normal joint range of motion consistent with causing or aggravating any significant injury to the body regions." She said that he also found that the after-market brake light covers on the 4Runner "obscured the taillights to an extent making it more difficult for the other driver to see the brake lights[.]" She stated that this finding factored into Defendant's investigation as it could have contributed to the accident.

Although not aware that Mr. Bogges had not seen photographs of Ms. Landry's vehicle before issuing his report, she stated:

> Were they necessary for him to make the calculations? You know, I don't know how they make their calculations exactly because I'm not a mechanical engineer, so I should not have stated what's important for them because I don't know for sure what's important for them to get their calculations.

She stated that the photographs did not depict a significant accident, but when asked if they depicted a "slight bump," she stated, "I probably wouldn't use the words slight bump, but then again I didn't feel it and I wasn't the driver."

Defendant also had hired a private investigator to perform surveillance of Plaintiff. She claimed that Defendant did so not because it thought Plaintiff was dishonest, but rather based on "the totality of the whole thing, with the low impact and the allegations that were being made and the fact that she was involved in extreme sports." While she admitted that the surveillance failed to provide any valuable information, she claimed that it validated Plaintiff's complaints.

56

Ms. Henschel testified that despite the inconsistencies in Plaintiff's medical records, Defendant made good-faith unconditional UM tenders of general and special damages. She said that she was aware of the penalty provisions contained in La.R.S. 22:1892 and La.R.S. 22:1973 and the *Housley* presumption. She further stated, "I think when somebody's got a structural damage, they can aggravate problems much more easily than if they don't have structural damage."

Based on her testimony, Ms. Landry did not know how fast she was going at the time of the accident. She first claimed that she was going thirty-five miles per hour before the accident because she had just seen her speed flashing on a portable radar system. She then contended that she was going slower than the speed limit prior to impact because traffic was "trying to merge in and turn off." Ms. Landry did not know Plaintiff's speed prior to impact, but stated that it was possible she was going slower than the speed limit, which she thought was thirty or thirty-five miles per hour. However, no matter Plaintiff's speed, she knew that Plaintiff was slowing down but was not completely stopped. Ms. Landry further described the impact as "a little bump, like a little tap." She stated that Plaintiff's 4Runner suffered minor damage in the area of her trailer hitch, and her vehicle, a Kia Sorrento, suffered minor damage where the trailer hitch punctured her front bumper.

According to Ms. Landry, Plaintiff suffered no apparent injury as a result of the accident. She stated that Plaintiff, whose hands were shaking, said that she was only a little shaken up, and she also told her and the responding officers that she was fine and did not require an ambulance. She denied that Plaintiff told her that her head was hurting. Although she was ticketed for careless operation, Ms. Landry claimed, as she did in her accident statement, that she was prevented from seeing Plaintiff's brakes by the black covers or frames on the brakes and because of the reflection from the sun's glare. Despite this claim, she admitted knowing that the

57

traffic ahead of her was either coming to a stop or was slowing down. Moreover, although her accident statement said that Plaintiff stopped because a vehicle in front of her made a sudden left turn, she testified that the road's curve prevented her from seeing anything ahead of Plaintiff.

Dr. Everett Robert, a neurosurgeon, testified as Defendant's expert. It was his opinion, after reviewing all of Plaintiff's medical records, that the accident only caused soft-tissue injuries to her cervical and lumbar spines, which should have been resolved within the three months. He further opined that any symptoms she experienced past that time were related to injuries caused by her ski accidents, which had never been surgically corrected.

Dr. Robert testified that Plaintiff's 2005 x-rays demonstrated 15° of kyphosis and four millimeters of translation in her cervical spine at C4-5. He stated that the cervical instability, kyphosis, and any disc damage revealed by those x-rays were objective findings of injuries and that Dr. Verst's 2005 recommendation of surgery was appropriate as the cervical instability would not heal by itself. He stated that since 2005, Plaintiff's x-rays revealed varying degrees of cervical instability, and he assumed, based on her imaging studies and C4-5 instability, that Plaintiff experienced pain between 2008–2014.

Dr. Robert stated that the medical records revealed that Plaintiff experienced cervical and lumbar complaints for quite a few years prior to the January 14, 2014 accident, as evidenced by the June 22, 2005 diagnosis of cervicalgia, neuropathy, C4-5 instability, and tenderness to palpation in the C5 region, and Plaintiff's February 2013 complaint of her back flaring up one to two times a week during exercise. He stated that Plaintiff potentially exacerbated the preexisting kyphosis and instability when she injured her neck in the April 6, 2009 ski accident. He also agreed that her occipital headaches in 2009 and 2012, were possibly cervical-related.

58

Dr. Robert further testified that the note of chronic back pain in the 2010 and 2013 physicals indicated that Plaintiff was still experiencing symptoms consistent with her anatomical injury. He claimed that the fact that she sought no treatment for her cervical issues between 2008–2009 and the date of the accident did not prove she was asymptomatic.

Because Plaintiff's pre- and post-accident imaging studies revealed no anatomical changes, Dr. Robert opined that she suffered a soft-tissue injury as a result of the accident. He stated that the studies also demonstrated that her preexisting cervical kyphosis and instability had not changed. Based on the lack of objective evidence and Plaintiff's subjective complaints of pain, Dr. Robert attributed her complaints to a soft-tissue injury. This was supported by the fact that the T2 signal on Plaintiff's MRI showed no evidence that her spine had been bruised. He further testified that it was possible for a person to suffer a soft-tissue injury on top of a pre-existing injury. Because Plaintiff's soft-tissue injury should have resolved within three months, he stated that her continuing complaints of pain could be related to either a re-exacerbation of her preexisting injury or a new injury.

Dr. Robert testified that none of Plaintiff's treating doctors causally related her symptoms, other than the strain, to the accident. Dr. Barker related the surgery he performed to Plaintiff's kyphosis and disc injuries at C4-5-6, which she, herself, related to her ski accidents. He further opined that physical therapy would not correct the gross cervical instability of four millimeters translation found in Plaintiff's cervical spine.

As to Plaintiff's pre-accident activity level, Dr. Robert stated that it is possible for people experiencing pain to do extraordinary things. Although he would not tell a person who was hurt to refrain from certain activities, he stated that it was certainly not advisable for a person with a history of a chronically injured spine to "do some

59

really high-end activity [or] work[.]" He further stated that it is impossible to tell if a person is in pain or that they have an anatomical injury just by looking at them in a photograph.

Dr. Robert further opined that absent the accident, Plaintiff still would have required surgery to fuse her C4-5 disc since this was the same surgery performed by Dr. Barker in 2017. No matter her pre-accident activity level, he absolutely would have recommended the surgery to her the day before the accident based on the gross instability of her cervical spine, which he described as a dangerous injury for an active person. His opinion was not affected by Dr. Jatana's finding regarding Plaintiff's C5-6 disc. However, he opined that because Plaintiff's cervical MRI revealed no demonstrable injury at any level, it was possible that the C4-5 and C5-6 discs were both causing her pain before and after the accident. He said that Plaintiff's February 25, 2014 cervical MRI revealed multiple mild degenerative changes and a kyphotic deformity, but revealed no clinically significant neuroforaminal stenosis or spinal stenosis. He disagreed with the finding of an annular fissure at C5-6.

Mr. Bogges, a forensic engineer, was accepted as Defendant's expert in accident reconstruction and biomechanics. After analyzing the accident, he determined that the difference in speeds between the vehicles prior to impact was ten miles per hour and that at most, the 4Runner experienced a 6.5 mph change in velocity (delta-v) when it was struck by the Kia. This, he stated, was equal to two times the force of gravity (2·g) for approximately .2 seconds. He further determined that the 6.5 mph delta-v was insufficient to take the lumbar and cervical spines of an occupant, of Plaintiff's age, height, and weight, outside of their normal ranges of motion.

60

Mr. Bogges testified that injury occurs when an accident involves both motion and force, which he stated was not present in this accident. He stated that in order to determine the 4Runner's delta-v, he first determined the speed differential by reviewing each vehicle's specifications and photographs of the damage suffered. He said that the accident did not involve much damage as there were only a few marks on the 4Runner and the puncture of the Kia's plastic bumper by the trailer hitch. He said that in order to understand the energy dissipated and absorbed by the vehicles involved in this collision, he compared the damage they suffered to that reported in published crash and bumper tests involving the same make of vehicles. After performing calculations related to conservation of energy, restitution, and momentum, Mr. Bogges determined the 6.5 mph delta-v of the 4Runner.[11] He agreed that an increased speed differential would increase the forces involved in the impact and cause more damage to the vehicles. He further noted that the police report indicated that the speed limit on Southpark Road was fifty miles per hour.

Mr. Bogges described the bumper of the 4Runner as consisting of an outer plastic shell, a Styrofoam absorber, and a metal bumper beam mounted to the rear body of the 4Runner. He stated that the steel-beam trailer hitch was attached to the 4Runner's frame or chassis, and while he admitted that the trailer hitch was stiff, he denied that it was rigid. He further said that although the 4Runner's body, including the occupant's seat, was attached to the frame, the energy exerted on the seat was dissipated by built-in horizontal and vertical dampening. Mr. Bogges testified that the damage report for the 4Runner revealed no structural damage. Based on 3D models of both vehicles and photographs of the vehicles, he determined that the 4Runner's trailer hitch punctured the lower part of the Kia's plastic bumper.

---

[11] Mr. Bogges described conservation of energy as "[e]ssentially, what comes in has to come out of the system." He described restitution as being "how bouncy things are."

61

However, his analysis indicated that the Kia's front bumper reinforcement bar, which is made of metal, was replaced as a result of the accident.

As to whether this accident would have caused an occupant to experience a structural injury, Mr. Bogges explained that when struck from the rear, a vehicle is pushed forward from the impact, carrying the occupant's lumbar spine, which is supported by the seat, forward. He stated that the head, which weighs approximately ten pounds, is initially left behind, causing the neck to extend backwards until the head impacts the headrest, after which the head is carried forward by the vehicle. From this information, he was able to calculate the shear force placed on the neck and the bending movement of the neck. From these values and based on the fact that the lumbar spine would have moved very little during the accident, Mr. Bogges determined that the forces exerted on the cervical and lumbar spines were not above the reasonable injury thresholds for the human body, as established by published data. Thus, he opined, the forces exerted on the cervical and lumbar spines were not consistent with causing significant injury.

Mr. Bogges testified that the 6.5 mph delta-v exerted on an occupant is very similar to that exerted on the human body by the activities of daily living. He stated that the act of bending down and tying a shoelace would exert more force on a person's lumbar spine than was exerted in the accident. Moreover, he stated that the act of a person plopping down into a chair, walking down a flight of stairs, or jogging would exert a similar force on their cervical spine as was exerted by the accident.

Mr. Bogges further determined that the 4Runner's black-edged brake light covers diminished or degraded the light output from the brakes by 30%, which could possibly result in a delay in a following driver's response time or cause them to miss the light all together. He stated that Louisiana law prohibits a driver from degrading the performance of a vehicle's lighting system. He further stated that as a result of

62

the 30% degradation, Ms. Landry's ability to see the brake lights could have been further affected by the sun's glare, which was coming from behind her as the January sun was located 30° above the horizon, south of Southpark Road. Thus, the sunlight would have hit Plaintiff's brake lights and then reflected back southwards towards Ms. Landry. He also testified that he found no evidence contradicting Ms. Landry's statement that she was presented with a sudden emergency due to Plaintiff's sudden stoppage or braking of her vehicle.

Mr. Bogges disagreed with Dr. Barczyk's accident-reconstruction opinion because his report did not indicate that a site inspection was performed of Southpark Road and because rather than making his own calculations, he utilized Mr. Bogges's numbers in reaching his conclusions. Mr. Bogges claimed that Dr. Barczyk said that there was no need to reconstruct the accident because it involved a rear-end collision. Mr. Bogges disagreed with this statement because "[y]ou have to understand the forces to understand what the risk is." He further claimed that Dr. Barczyk's discussion about the accident was very generic and, although he did discuss injuries, he failed to discuss the specific injury at issue or the specific mechanism that would cause a posterior C4-5 protrusion. Mr. Bogges further dismissed Dr. Barczyk's statement regarding plasticity that a person driving a vehicle that is not damaged can suffer worse injuries than someone driving a vehicle that is damaged. He explained that here, there was a very specific system of two vehicles that were designed to crush. Thus, he opined that the amount of damage resulting from the accident was very relevant to its reconstruction because if there was not a lot of damage, then the accident did not involve a lot of force.

Herman Ledet, a nurse practitioner, testified that when he examined Plaintiff after the accident, she complained of pain in the occipital region of her head and in her neck and lower back. He stated that he diagnosed Plaintiff with a head contusion

63

and cervical and lumbar sprains for which he prescribed anti-inflammatories, muscle relaxers, and pain medication. Although the x-rays revealed no objective evidence of injury, NP Ledet testified that his contusion diagnosis was based on Plaintiff's statement that she hit her head on the headrest. Likewise, his cervical and lumbar sprain diagnoses were based on the mechanism of injury and her complaints. He found Plaintiff's complaints of pain to be credible.

Dr. Barczyk, who was called on rebuttal, disagreed with Mr. Bogges's opinion because he ignored the effect the steel trailer hitch had on the forces exerted on Plaintiff at impact and because he estimated the speeds of the two vehicles. Dr. Barczyk testified that because Plaintiff's trailer hitch was an after-market part, it differed dramatically from a standard Toyota trailer hitch and would have significantly affected the crush caused by the impact, as well as the movement of the occupant in the passenger compartment. He further claimed that it was improper for Mr. Bogges to rely on known crash-test data involving standard Toyota trailer hitches in calculating the forces exerted on the 4Runner because he was not aware of any crash-test results involving this trailer hitch.

Dr. Barczyk explained that because the trailer hitch stuck out from the 4Runner's bumper, it was the first part of the 4Runner that was struck by the Kia. After this first impact, he stated, the trailer hitch tore through the Kia's plastic bumper and foam absorber within milliseconds before coming into contact with its metal reinforcement bar. He stated that although the Kia would have slowed down after hitting the trailer hitch, the impact was still hard enough to bring its bumper into contact with the 4Runner's bumper. Thus, Dr. Barczyk opined, the collision between the two bumpers was secondary to the collision of the Kia's bumper with the trailer hitch. He further opined that the presence of the trailer hitch prevented the 4Runner's bumper from crushing as much as it would have if it were not present.

64

Dr. Barczyk testified that the Kia's damage report indicated that its metal reinforcement bar was damaged and required replacement following the accident. He stated that this damage was caused by the trailer hitch and not the 4Runner's plastic bumper. Thus, he opined that the collision between the 4Runner and the Kia was a stiff to stiff collision, and depending on the stiffness, the trailer hitch changed the behavior of the two vehicles and their occupants during the collision. He further opined that in a lower speed stiff to stiff collision it is possible for more energy to be transferred to the occupants than in a collision involving greater crush since crush is designed to absorb energy, thereby, protecting the occupants.

With regard to the speed of the vehicles prior to the accident, Dr. Barczyk testified that based on their testimonies, Plaintiff was almost stopped and Ms. Landry was traveling between thirty to thirty-five miles per hour. However, he stated that Mr. Bogges estimated that Plaintiff was traveling at ten miles per hour, and Ms. Landry was traveling at twenty miles per hour. He explained that this was problematic because when lower speeds are involved, if the speed of each vehicle is "off in − three miles per hour in the opposite direction in the estimates, the math is going to change fairly dramatically, as a percentage of the delta-v that he has at six-and-a-half miles per hour." Dr. Barczyk testified for this reason he did not attempt to estimate the speeds of the vehicles. He stated that low-speed collisions are defined as those with a delta-v of under eight to ten miles per hour. He stated that despite his disagreeing with Mr. Bogges's estimates, he used the 6.5 mph delta-v to show that it would still provide a "solid lick for a human occupant."

Dr. Barczyk further testified that Mr. Bogges's calculation of the gravitational forces exerted on the occupant of the 4Runner was incorrect because the gravitational forces exerted on a vehicle vary dramatically from that exerted on its occupant. Mr. Bogges calculated that the gravitational force exerted on the 4Runner

65

as a result of its 6.5 mph delta-v was, on average, 2·g and, at its peak, 4·g. He explained that the forces experienced by an occupant are based on Newton's First Law pertaining to inertia, which provides that "[b]odies in motion stay in motion. Bodies at rest stay at rest. Unless they're acted upon by an outside unbalanced force." Thus, Dr. Barczyk explained, an occupant has inertia compared to the vehicle because he or she is traveling horizontally through space without being attached or bolted to the vehicle. Consequently, when a rear-end collision occurs, the vehicle, and the occupant's torso, head, and neck always move in the exact same order: the vehicle moves first, the torso moves second, and the head and neck move third. He said that the only variables pertain to the times in which these three movements occur.

Dr. Barczyk explained that because the occupant's torso is touching the seat, the torso moves later than the vehicle due to inertia; thus, a little more force is exerted on the torso than the vehicle. However, because the head and neck are not touching anything, they are the farthest removed from the vehicle and have to move faster in order to catch up with the vehicle. Thus, Dr. Barczyk testified that the peak acceleration exerted on the head and neck would be, on average, two to four times the peak acceleration of the vehicle. So, he stated, if the peak acceleration exerted on a vehicle is 4·g, then the peak acceleration exerted on the occupant would be between 8·g and 16·g.

Regarding Mr. Bogges's finding that the forces exerted by the accident were insufficient to cause significant injury, Dr. Barczyk testified that there is no comparison between a rear-end collision and a person plopping down into a chair. He stated that plopping into a chair does not dramatically change the curvature of the cervical spine to a shallow S-curve, and it does not do it within an accident's 75-to-125-millisecond crash pulse. Moreover, he said that in a stiff to stiff collision,

66

such as between a trailer hitch and a reinforcement bar, there is more bounciness or springiness, which results in a shorter crash pulse and a greater transfer of energy to the passenger compartment. He stated that when a collision involves vehicles that crush together, the crash pulse is longer, which is better for the vehicles' occupants. Additionally, he stated that a person plopping into a chair is aware of what they are doing, whereas in a rear-end collision, the leading driver is surprised by the collision, and their body's abnormal movements occur in under 150 milliseconds.

Dale Johnson, a litigation specialist with Kemper, became involved in Plaintiff's claim in February 2021. It was her opinion, after reviewing Plaintiff's file and listening to the trial testimony, that Defendant did not act arbitrarily or capriciously in handling Plaintiff's claim. She explained that two policy coverages were at issue in this matter—the med-pay coverage, which was automatic, and the UM coverage, which was not automatic. She said that in order to recover under the UM coverage, Plaintiff had to produce satisfactory proof of loss proving that her injuries were caused by the accident and that her damages exceeded Ms. Landry's insurance coverage. She said that although Plaintiff bore the responsibility of obtaining proof of no other coverage, Defendant, rather than Plaintiff, located Ms. Landry and obtained the affidavit providing the information. She testified that Defendant did this in an effort to move Plaintiff's claim along.

Ms. Johnson claimed that despite Plaintiff's claim of being asymptomatic before the accident, she told the adjuster after the accident that she had chronic neck and back problems. She stated that Defendant heard nothing further from Plaintiff until the suit was filed. She said that based on the information provided by Plaintiff, Defendant reviewed her medical records to determine if she had any preexisting injuries since UM coverage only applies to injuries caused by the accident. As a result, it learned of Plaintiff's chronic back pain from her 2010 and 2013 physicals.

67

Ms. Johnson contended that Defendant had reasonable grounds to conclude that Plaintiff only suffered a soft-tissue injury as a result of the accident and that her ongoing cervical and lumbar issues were caused by her preexisting structural injuries. She stated that immediately following the accident, Plaintiff was diagnosed with a head contusion, and cervical and lumbar sprains. Additionally, Dr. Romero, who found no objective sign of injury and did not recommend surgery, referred her to Dr. Lasseigne for non-surgical treatment. She further pointed to Plaintiff's statement to her physical therapist[12] that she had improved forty percent since the accident, that all of her complaints of pain were subjective, and that all of the objective signs throughout her medical records were within normal limits.

Ms. Johnson testified that after obtaining Ms. Landry's affidavit and despite the fact that it was still awaiting satisfactory proof of loss, Defendant tendered $20,518.26 on April 20, 2016, its first UM tender.[13] She stated that it tendered an additional $3,891.73 on March 6, 2017, based on medical bills it had received in relation to Plaintiff's undisputed soft-tissue injury. Ms. Johnson said that Defendant tendered an additional $30,000.00 on September 14, 2017, consisting of $16,000.00 in general damages and $14,000.00 in medical expenses for treatment she received during the six week period between November 2015–March 2017. She submitted that Defendant never received documentation from any of Plaintiff's treating doctors relating her injuries, other than the soft-tissue injury, to the accident.

Ms. Johnson stated that Defendant relied on Dr. Roth's causation opinion in its handling of Plaintiff's claim. She said that Dr. Roth, after reviewing all of Plaintiff's medical records through March 10, 2017, opined that Plaintiff only

---

[12] This statement was actually made to Dr. Lasseigne.

[13] The tender was for $60,518.26 ($34,000.00 plus medicals) minus $15,000.00 (Ms. Landry's policy limits) and $25,000.00 (Plaintiff's med-pay coverage).

68

suffered a soft-tissue injury as a result of the accident, which would have resolved within six months. Despite this opinion, Defendant gave Plaintiff the benefit of the doubt when it made its first UM tender of $20,518.26 to Plaintiff on April 20, 2016, which covered twenty-two months of treatment.

Ms. Johnson testified that Defendant further relied on the fact that none of Plaintiff's treating doctors could say, with any degree of medical certainty, that the accident caused her cervical and lumbar issues. She noted that neither Dr. Barker nor Dr. Jatana causally related their surgeries to the accident and, in fact, deferred the question of causation to Dr. Romero, who, she insisted, did not feel that Plaintiff was a surgical candidate. While Ms. Johnson acknowledged that Dr. Romero causally related Plaintiff's cervical and lumbar symptoms to the accident, she pointed out that he could not state with certainty whether the accident caused an aggravation of her preexisting injuries or a new injury. She further pointed out that Dr. Jatana related Plaintiff's anatomical injury to her ski accidents and that Dr. Barker said that Plaintiff had related her condition to her ski accidents. She added that Dr. Barker testified that the surgery he recommended was the same surgery recommended to her in 2005.

As to the C5-6 fusion performed by Dr. Jatana, Ms. Johnson admitted that while she was not aware of any MRI that demonstrated abnormal cervical findings prior to the accident, Plaintiff's February 25, 2014 cervical MRI did demonstrate abnormal findings. Nevertheless, she asserted that Plaintiff's later cervical MRIs revealed degenerative changes not shown on her February 25, 2014 MRI. She further testified that Defendant's expert, Dr. Robert, found evidence of a focal kyphosis at C5-6 on a January 23, 2005 x-ray. She related Plaintiff's C5-6 issue to her subsequent accidents or to adjacent segment degeneration caused by the fused C4-5 disc. Furthermore, she stated that Dr. Robert, the only physician to review all

69

of Plaintiff's medical records and imaging studies, did not relate her ongoing cervical and lumbar issues to the accident.

Ms. Johnson testified Defendant also noted inconsistencies in Plaintiff's statements to her treating physicians throughout its investigation:

> [T]hroughout her treatment, there were periods where she would note that she was getting better. But, then, there's also notes where – I went hiking in Colorado, and you know, my back is hurting, and things are bothering me.
>
> So she was doing things, and she was showing some improvement. But, then, there's also things that she was doing that were aggravating her condition.
>
> The doctors noted that she had a degenerative condition. Degenerative conditions don't get better. Over time, based upon your activity and the things you do – can actually kind of make – kind of speed the process along.
>
> I noticed, from my own experience, 11 years ago[.]

She also insisted that Plaintiff either reinjured herself or suffered new injuries subsequent to the accident as a result of her November 2016 accident and her falls in 2017 and 2018, as well as her participation in extreme activities such as hiking and kayaking. Ms. Johnson further asserted that Plaintiff failed to mitigate her damages by performing these same types of activities or by undergoing unnecessary treatment that had previously proven non-beneficial. She pointed out that Plaintiff continued to receive physical therapy after Dr. Lasseigne stated that her improvement from such therapy had plateaued, and Dr. Barker's recommendation that she undergo further injections after Dr. Lasseigne found that they offered her no relief.

Ms. Johnson testified that issues of causation were also raised by Ms. Landry's assertions in response to Plaintiff's suit.[14] She stated that Ms. Landry claimed that

---

[14] We note that neither Ms. Landry nor State Farm filed an answer in this matter. The affirmative defense of sudden emergency was raised by Defendant in its amended answer.

her ability to timely stop was affected by the presence of black tape surrounding Plaintiff's brake lights and by her sudden stop. Because these issues raised questions regarding Plaintiff's comparative fault, Defendant could not know the full extent of Ms. Landry's liability until the matter was litigated.

Ms. Johnson admitted that Defendant has a contractual relationship with Plaintiff through its insurance policy, and she was also familiar with the penalty provisions in La.R.S. 22:1892 and La.R.S. 22:1973. However, she asserted that Defendant is not required by statute to presume that Plaintiff's injuries are causally related to an accident if her symptoms after the accident are greater than those before the accident. This, she stated, would contradict Defendant's UM policy language, which required Plaintiff to prove causation as a result of the accident. Ms. Johnson further claimed that despite Defendant's request for prior notice of any scheduled surgery, it first learned about Dr. Barker's June 30, 2017 surgery in August 2017, after the fact.

Ms. Johnson stated that based on its information, Defendant made three unconditional tenders under Plaintiff's UM coverage. When questioned regarding the medical records introduced by Plaintiff into the record, Ms. Johnson contended that except for proving that she suffered a soft-tissue injury, they failed to establish satisfactory proof of loss. She explained that most of the records were received under a cover letter stating that Plaintiff was submitting more medical records, rather than stating that they were from doctors relating the medical expenses to Plaintiff's accident. This, she claimed, was insufficient to causally relate the medical expenses to the accident. Ms. Johnson admitted that Defendant received Plaintiff's August 7, 2019 request for an additional tender related to the cost estimates for the first surgery recommended by Dr. Jatana. However, she asserted that Defendant does not pay

71

claims based on estimates, especially when Plaintiff failed to establish that the surgery was causally related to the accident.

After reviewing the record in its entirety, we find that the jury was presented with differing views of the evidence regarding whether Defendant had a reasonable and legitimate question for failing to pay Plaintiff's claim timely. In addition to the wealth of medical evidence related to Plaintiff's pre- and post-accident condition, the jury heard explanations from Defendant's adjusters regarding the reasoning behind its evaluation of Plaintiff's claim and its tender of only $54,409.99 on her UM claim. Based on this evidence, the jury determined that Plaintiff was in reasonably good health prior to the accident, considering her prior sports endeavors, injuries, and lifestyle, but that as a result of the accident, she experienced an immediate onset of pain. Subsequent to the accident, Plaintiff's condition continued to deteriorate despite her efforts to recover.

Although the jury was presented with evidence regarding Defendant's methodical investigation process, it was also presented with evidence establishing that from the start of its investigation, Defendant chose to minimize Plaintiff's injuries precisely because she was a former competitive athlete with a history of sport-related injuries. Defendant focused on minimizing the accident itself, claiming that the minor accident could not possibly cause significant injury, and relying on the self-serving claim of Ms. Landry that the impact only involved "a little bump, like a little tap." It further hired an expert in accident reconstruction to support its position and hired a private investigator to dig up aggravating evidence against Plaintiff, which did not materialize.

Defendant also hired medical experts to attempt to minimize Plaintiff's claim despite a wealth of medical evidence already available, and it ignored a significant quantity of medical evidence of Plaintiff's condition post-accident. It relied on the

72

early diagnosis of cervical and lumbar sprains and Dr. Romero's finding that she was not a candidate for surgery five months after the accident, despite his note that this finding was based on her presentation at the time and the fact that he could give her no assurances that her pathology might not worsen. Defendant further relied on the alleged inconsistencies in Plaintiff's reporting of her medical histories, although the records indicate that throughout her extensive post-accident medical history, she consistently relayed that she had suffered previous neck and back injuries from skiing even if the doctors did not document the correct accident dates or the correct number of accidents. Only Dr. Jatana, who treated Plaintiff specifically for her cervical complaints following her first surgery, stated that she did not tell him about the lumbar issues related to her 2008 ski accident.

The jury further heard conflicting evidence regarding whether Plaintiff was asymptomatic prior to the accident. Although Defendant relied on Dr. Roth's opinion that Plaintiff was experiencing complaints related to her preexisting injuries prior to the accident, it also heard testimony, as noted in his report, that Plaintiff had not sought treatment for neck or back pain in the eighteen months prior to the accident. Dr. Roth's report further stated that Plaintiff's claim that she was asymptomatic before the accident was consistent with lack of medical records indicating treatment for her neck or back issues between 2009–2010 and the date of the accident.

Defendant further relied on Dr. Robert's testimony that Plaintiff's post-accident cervical complaints were related to her preexisting cervical instability based on Dr. Verst's January 28, 2005 diagnosis, five days after the accident, that she had 15° kyphosis and four millimeters translation of the C4-5 vertebra. However, despite this diagnosis, none of Plaintiff's numerous, subsequent cervical x-rays revealed cervical instability, which Dr. Romero described as being 3.5 millimeters or greater,

73

although they revealed mild kyphosis at C4-5 and C5-6, with either none or minimal translation at those levels. Moreover, Dr. Robert even admitted that while cervical instability will not heal, it can be aggravated.

Additionally, all of the UM tenders made by Defendant, the last dated September 14, 2017, occurred prior to Dr. Roth's October 27, 2017 medical opinion. Thus, although Defendant claimed that it was giving Plaintiff the benefit of the doubt through its April 20, 2016 tender, which covered twenty-two months of treatment, this claim was not true since it had not yet received Dr. Roth's report.

The jury determined that Defendant's conduct was in bad faith and that based on all of the available evidence, it would not have been in bad faith had it tendered at least $325,000.00 to Plaintiff during the course of her treatment. Much of this determination was based on the jury's credibility determinations and weighing of the evidence, after which it chose to minimize the testimony of Defendant's representatives and experts. It is not this court's duty to reweigh or reconsider these findings, but only to decide whether the jury's decision was reasonable and rational given the overall evidence. Based on these facts, we cannot conclude otherwise. Accordingly, the jury's verdict finding that Defendant was in bad faith and the trial court's denial of Defendant's motion for a JNOV are affirmed.

### PLAINTIFF'S APPEAL

*Assignment of Error Number One*

In her first assignment of error, Plaintiff argues that the trial court erred in reducing the amount of damages awarded by the jury from $700,000.00 to $500,000.00, the UM policy limits, when Defendant failed to proffer the policy during the jury trial. We find this argument to be misleading as both Defendant and Plaintiff were barred from submitting the policy limits to the jury pursuant to La.Code Evid. art. 411.

74

At the start of the trial, the parties stipulated that Defendant was Plaintiff's UM provider on the date of the accident and that the policy was "authentic for all purposes other than policy limits[.]" A copy of the insurance policy, with redacted policy limits, was introduced into evidence by Plaintiff. In rendering its verdict, the jury awarded Plaintiff a total of $700,000.00 in damages. Subsequently, Defendant moved for remittitur and revision of the judgment to reduce the jury award by the amount of the credits to which it was entitled and attached a copy of the unredacted policy limits, which established the UM policy limits as $500,000.00. The unredacted policy limits were also attached to Defendant's opposition to Plaintiff's motion to assess penalties and attorney fees. Plaintiff moved to strike the policy limits on the grounds that Defendant failed to proffer it during the jury trial.

In denying Plaintiff's motion to strike, the trial court orally ruled:

Under the Code of Evidence Article 411, there is a prohibition against providing the policy limits to the jury. In keeping with that, under the initial stipulations that were entered, the policy was put in, with a redaction of the limits.

The argument being made that the failure to include those limits results in a – in no limit on the policy is, I find, a very specious argument, in light of Code of Evidence Article 411. Everyone was aware, at the time, that there was a limit, except for the jury.

And so I'm denying that motion to strike. It is appropriate that the amount of the limits be part of the record not given to the jury but considered in terms of the potential liability of the defendant in this case.

In the February 1, 2022 judgment, the trial court recognized the "Uninsured/Underinsured contractual policy limits held by Defendant . . . to be the amount of $500,000.00." After reducing the $700,000.00 jury award to $500,000.00, and then by an additional $69,798.48 in credits, the trial court awarded Plaintiff $430,201.53 in damages.

75

Louisiana Code of Evidence Article 411(A) provides that "[a]though a policy of insurance may be admissible, the amount of coverage under the policy shall not be communicated to the jury unless the amount of coverage is a disputed issue which the jury will decide." Thus, under no circumstances were the parties allowed to introduce Defendant's policy limits into the record during the jury trial. Furthermore, an insurance policy is only admissible during a jury trial in certain instances, one being if "[t]he cause of action is brought against the insurer pursuant to R.S. 22:1973[.]" La.Code Evid. art. 411(B)(3). Here, the parties stipulated to the insurance policy, minus the policy limits, as required by law. Thus, we agree that all parties, excluding the jury, were aware of the policy limits. Accordingly, we find no merit in this assignment of error.

*Assignment of Error Number Two*

In this assignment of error, Plaintiff argues that the trial court miscalculated the amount of statutory penalties awarded to her under La.R.S. 22:1892. Her argument is two-fold. She first argues that the seventh question on the jury verdict form was misleading and confusing in that it allowed the jury to calculate the penalty amount, which it argues was within the sole province of the trial court. However, we find that we need not address this argument as Plaintiff "waived any objection to the form by failing to preserve the issue for appeal by contemporaneously objecting to it." *Royer v. State Dep't of Transp. & Dev.*, 16-534, p. 17 (La.App. 3 Cir. 1/11/17), 210 So.3d 910, 923, *writ denied*, 17-288 (La. 4/24/17), 221 So.3d 69. Thus, we find no merit in this argument.

Plaintiff next argues that the trial court miscalculated the penalty by applying the formula found in La.R.S. 22:1892(B)(1)(a) to $325,000.00 rather than to $630,251.53, which is the $700,000.00 jury award minus the credits received by Defendant.

76

In calculating the penalties, the trial court stated:

[A]s we know, there are two statutes that were pled in this case – 22:1892 and 22:1973 – both of which provide a penalty for failure to adjust and/or pay claims.

I note that 22:1892 is, really the former Article 658. So there's some cases that have dealt with that article which would apply to that statute. And that 22:1973 is the former Article 1220.

I know, Mr. Landry, you make the argument that she's entitled to both. The cases clearly say you are not entitled to recover under both provisions.

In this case, the jury made a finding of the amount, which they held had been withheld arbitrarily and capriciously. And it was not the total amount of their award. But it was the amount of $325,000.00. The jury did not find that that was damages sustained by the plaintiff, but, rather, that that was the amount that they had failed to pay when due.

So the Court finds that the penalty provision that applies in this case is 22:1892, which is the former 22:658, which is 50 percent of the amount found to be due.

Applying this statute, the trial court awarded Plaintiff penalties in the amount of $162,500.00, which was fifty percent of the $325,000.00 the jury found Defendant had arbitrarily, capriciously, or without probable cause failed to pay.

Louisiana Revised Statutes 22:1892 provides in part:

A. (1) All insurers issuing any type of contract, other than those specified in R.S. 22:1811, 1821, and Chapter 10 of Title 23 of the Louisiana Revised Statutes of 1950, shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest. The insurer shall notify the insurance producer of record of all such payments for property damage claims made in accordance with this Paragraph.

. . . .

B. (1)(a) Except as provided in Subparagraph (b) of this Paragraph, failure to make such payment within thirty days after receipt of such satisfactory written proofs and demand therefor . . . when such failure is found to be arbitrary, capricious, or without probable cause, shall subject the insurer to a penalty, in addition to the amount of the loss, of fifty percent damages on the amount found to be due from the insurer to the insured, or one thousand dollars, whichever is greater, payable to the insured, or in the event a partial payment or tender has

been made, fifty percent of the difference between the amount paid or tendered and the amount found to be due as well as reasonable attorney fees and costs. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

In *Durio v. Horace Mann Insurance Co.*, 11-84 (La. 10/25/11), 74 So.3d 1159, the supreme court held that penalties awarded under La.R.S. 22:658[15] arise from an insurer's breach of the contractual obligations it owes the insured under the insurance contract, rather than from the breach of its statutory duty of good faith and fair dealing as provided in La.R.S. 22:1220.[16] Thus, the supreme court held that the penalties due under La.R.S. 22:658 are "calculated based on amounts due under the insurance contract[.]" *Id.* at 1170.

Accordingly, we find no error in the trial court's award of $162,500.00 in penalties to Plaintiff pursuant to La.R.S. 22:1892(B)(1)(a). The jury specifically

---

[15] Louisiana Revised Statutes 22:658 was redesignated and renumbered as La.R.S. 22:1892 by 2008 La. Acts No. 415, § 1.

[16] Louisiana Revised Statutes 22:1973, redesignated and renumbered from La.R.S. 22:1220 by 2008 La. Acts No. 415, § 1, provides, in part:

A. An insurer . . . owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.

B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A of this Section:

. . . .

(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.

. . . .

C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater.

78

found that the amount Defendant arbitrarily, capriciously, or without probable cause failed to pay Plaintiff was $325,000.00, which amount, we note, corresponds to the amount of medical expenses awarded to her. Thus, we find that the trial court did not err in calculating Plaintiff's penalty award based on the amount due to her under the terms of her insurance contract with Defendant. Based on the foregoing, this assignment is dismissed as being without merit.

### *Assignment of Error Number Three*

In her third assignment of error, Plaintiff argues that the jury's general damage award of $375,000.00 is abusively low, and that the lowest reasonable amount that she could be awarded is $600,000.00. We disagree.

Defendant's liability in this matter is contractual in nature, and the insurance contract at issue sets the limits of Defendant's UM liability at $500,000.00. Thus, because the $500,000.00 policy limit is the law between the parties, Defendant's liability cannot exceed this amount. *Preston v. Safeco Ins. Co. of Or.*, 21-647 (La.App. 1 Cir. 12/22/21), 340 So.3d 94. Considering the amount of damages awarded to Plaintiff by the February 1, 2022 judgment, Defendant's policy limits have been exhausted. Accordingly, we find no merit in this assignment.

### *Assignment of Error Number Four*

In her fourth assignment of error, Plaintiff argues that the attorney fees awarded to her should be increased due to the trial court's miscalculation of the penalties awarded and the jury's abusively low general damage award, as argued in her second and third assignments of error. However, we find that our dismissal of those assignments of error renders this assignment of error moot. Accordingly, we need not address this assignment.

79

*Assignment of Error Number Five*

In her final assignment of error, Plaintiff requests an additional award of attorney fees for work performed by her counsel on appeal. In *Vander v. Safeway Insurance Co. of Louisiana*, 08-888, p. 12 (La.App. 3 Cir. 2/25/09), 5 So.3d 968, 976, we held that "[t]he basis for awarding additional attorney's fees for work performed on appeal is that the litigant incurred additional expenses to protect rights or increase awards established at the trial level."

> "An increase in attorney's fees for services rendered on appeal is *usually* awarded when the defendant appeals and obtains no relief on appeal, and when the plaintiff requests it in accordance with proper appellate procedure." *Riche v. Krestview Mobile Homes, Inc.*, 375 So.2d 133, 138 (La.App. 3 Cir.1979). (Emphasis added.) "Because attorney fees were correctly awarded below, to not award increased attorney fees for the additional work required for this appeal would be inconsistent with that judgment." *Acadian Serv., Inc. v. Durand*, 01-1554, p. 4 (La.App. 3 Cir. 4/3/02), 813 So.2d 1142, 1144.

*Id.* at 975.

Because the trial court awarded attorney fees to Plaintiff pursuant to La.R.S. 22:1892(B)(1)(a), and Plaintiff has successfully defended her bad-faith claim on appeal, we find that an award of $10,000.00 in additional attorney fees is reasonable.

### DECREE

For the foregoing reasons, the judgment of the trial court in favor of Alisa Alan Durkheimer is affirmed. Judgment is further rendered awarding Alisa Alan Durkheimer $10,000.00 in attorney fees for work performed by her attorney on appeal. The costs of this appeal are assessed to Trinity Universal Insurance Company.

**AFFIRMED AND RENDERED.**